Troy M. Yoshino, Bar No. 197850
troy.yoshino@squirepb.com
Eric J. Knapp, Bar No. 214352
eric.knapp@squirepb.com
Steven E. Swaney, Bar No. 221437
steven.swaney@squirepb.com
**SQUIRE PATTON BOGGS (US) LLP**
Attorneys at Law
44 Montgomery Street, Suite 400
San Francisco, California 94104
Telephone: 415.989.5900
Facsimile: 415.989.0932

Attorneys for Defendant
MERCEDES-BENZ USA, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WILLIAM S. CALLAWAY, on behalf of himself and all others similarly situated,

Plaintiff,

v.

MERCEDES-BENZ USA, LLC, a Delaware limited liability company,

Defendant.

Case No. 8:14-cv-02011-JVS (DFMx)

**DECLARATION OF LORIN M. HITT, PH.D, IN SUPPORT OF MERCEDES-BENZ USA, LLC'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

**Page**

I. QUALIFICATIONS ..... 1
II. BACKGROUND, SUMMARY OF ALLEGATIONS, AND ASSIGNMENT ..... 4
III. SUMMARY OF CONCLUSIONS ..... 6
IV. SUMMARY OF SUKUMAR AND MCFARLANE DECLARATIONS ..... 10
A. Sukumar Declaration ..... 10
B. McFarlane Declaration ..... 11
V. THE METHODOLOGY RELIED ON BY PLAINTIFF CANNOT DETERMINE EQUILIBRIUM MARKET PRICES BECAUSE PLAINTIFF'S EXPERTS DO NOT PROPERLY DEFINE THE MARKET, FAIL TO ACCOUNT FOR SUPPLY FACTORS, AND RELY SOLELY ON SOME OF THE DEMAND-SIDE FACTORS ..... 12
A. Plaintiff's Experts Do Not Properly Define the Relevant Market ..... 14
B. Plaintiff's Experts' Claim that They Considered Supply Factors is False—They Improperly Assumed Supply Factors Out of Their Analysis ..... 16
1. There Is No Basis for the Assumption That Competition Would Not React ..... 17
2. Contrary to Plaintiff's Experts Assumptions, the Supply of Class Vehicles is Not Constant ..... 20
3. Mr. McFarlane's "Profits" Analysis is Fundamentally Flawed, Inconsistent with Standard Economic Model of Producer Behavior, and Does Not Validate Dr. Sukumar's Fixed Supply Assumption ..... 21
C. Application of "Formula 14" Does Not Yield a Market Price ..... 25
VI. DR. SUKUMAR'S CONJOINT DESIGN DOES NOT REFLECT REAL-WORLD CHOICES MADE BY CONSUMERS AND, THEREFORE, CANNOT ACCURATELY ESTIMATE REAL-WORLD MARKET PRICES ..... 28
A. Dr. Sukumar's Survey Presents an Artificial Scenario that Does Not Reflect Real-World Purchasing Decisions ..... 29

**TABLE OF CONTENTS**
(continued)

**Page**


B. The Choice Between a Seat Heater with "1/100 Chance of Safety Risk" and a "Perfect" Seat Heater is Inconsistent with the Facts of the Case, Does Not Reflect Choices Consumers Face in the Real World, and Introduces Biases to Dr. Sukumar's Survey Results ..... 31

C. Prices Presented in Dr. Sukumar's Survey Do Not Reflect Real-World Prices ..... 35

**VII.** The Impact, if Any, of a Disclosure Cannot Be Determined Through a Common Method Because a "Market Price" for All Class Vehicles Does Not Exist and the Idiosyncratic Factors Affecting Transaction-Specific Prices Require Individualized Inquiry ..... 37

A. There Is No Scientific Validity for the Assumption that Dr. Sukumar's $609 Discount Would Have Applied Equally to All Relevant Purchase Transactions Since the Factors that Affect Market Prices Vary Across Transactions ..... 38

B. Plaintiff Cannot Determine the Impact, If Any, of a Hypothetical Disclosure of the Alleged Defect without Individualized Inquiry ..... 42

**VIII.** Dr. Sukumar's Results Indicate that Many Class Members Were Not Harmed by Lack of Disclosure of the Alleged Defect and There is Substantial Variation in Discounts that Dr. Sukumar's Respondents Would Demand Individually ..... 43

A. Removal of Dr. Sukumar's Arbitrary Attribute Constraints Shows that Many Consumers Would Not Be Harmed if MBUSA Disclosed the Alleged Defect ..... 43

B. Most Survey Participants Do Not Show a Statistically Significant Difference in Their Preferences Between a "Perfect" and a "Defective" Seat Heater ..... 45

C. There is Substantial Variation in Discounts that Dr. Sukumar's Respondents Would Demand Individually, if MBUSA Disclosed the Alleged Defect ..... 46

D. Dr. Sukumar's Discount Calculation is Heavily Influenced by Extreme Values ..... 48

E. Dr. Sukumar's Discount Calculation is Heavily Influenced by Arbitrary Assumptions on How Survey Responses Convert to Dollar Values ..... 49

## TABLE OF CONTENTS
(continued)


**Page**

**IX.** DR. SUKUMAR MAKES NO ATTEMPT TO VALIDATE HIS RESULTS AND EVIDENCE SUGGESTS THAT DR. SUKUMAR'S ESTIMATES ARE INCONSISTENT WITH REAL-WORLD DATA .......... 50

**X.** PLAINTIFF OFFERS NO METHODOLOGY FOR DETERMINING APPORTIONMENT OF ANY MARKET PRICE CHANGE ACROSS MULTIPLE RESALE TRANSACTIONS .......... 52

## I. QUALIFICATIONS

1. My name is Lorin Moultrie Hitt. I am the Zhang Jindong Professor of Operations, Information and Decisions (OID) at the University of Pennsylvania, Wharton School. My research and teaching focuses on the economics and management of information systems, the value of technology investments, and consumer behavior, firm organization and market structure.

2. I received my Ph.D. in Management from the Massachusetts Institute of Technology Sloan School of Management in 1996, and my Sc.B. (1988) and Sc.M. (1989) degrees in Electrical Engineering from Brown University.

3. I have taught undergraduate, masters, doctoral, and executive education level courses at the University of Pennsylvania and the Massachusetts Institute of Technology on competition and customer pricing in a variety of commercial and consumer markets, information systems management, and information economics and data analysis. My research is characterized by rigorous economic analysis and I am well-versed in econometric and statistical methods. A number of my published research papers focus specifically on empirically modeling consumer choice behavior in product and service markets.[1] In my Ph.D. seminar, I cover a variety of empirical methods used in economic research, including methods

---

[1] Examples include work in the online brokerage industry that utilizes an extension of discrete choice modeling such as that used in this case. *See* Chen, P. and L. M. Hitt (2002), "Measuring Switching Costs and the Determinants of Customer Retention in Internet Enabled Businesses: A Study of the Online Brokerage Industry," *Information Systems Research*, 13(3), 255–274; Chen, P. and L. M. Hitt (2005), "Information Technology and Switching Costs," in *Handbook on Economics and Information Systems*, T. Hendershott, ed. Amsterdam: Elsevier. I have also done a number of other studies that include empirical analysis of individual or aggregate consumer behavior using other types of modeling. *See* published papers 9, 10, 11, 13, 15, 16, 17, 27, 28 in Exhibit 1.

for estimating product demand and valuing product features in differentiated products using techniques developed by both marketing researchers and econometricians. My research has been published in the *Quarterly Journal of Economics*, the *Review of Economics and Statistics*, the *Journal of Economic Perspectives*, *Management Science*, *Information Systems Research* and a number of other top-tier outlets. I hold, or previously held, senior editorial positions at three major research journals: *Management Science* (former Department Editor), *Information Systems Research* (former Senior Editor), and *Journal of Management Information Systems* (Editorial Board member).

4. All of my research is based on applied economic theory and practice, and the majority of my papers rely on developing and testing economic or management theories using empirical data and econometric and statistical methods. This research has specifically included research on the factors that influence consumer retail prices, such as competition, market structure, consumer information, product attributes, and past purchase behavior. My Ph.D. training focused heavily on empirical methods, including having a large component of my Ph.D. qualifying exam based on econometrics (administered by Jerry Hausman, Massachusetts Institute of Technology, a leading econometrician). My doctoral dissertation committee included Zvi Griliches (Harvard University), a former chairman of the American Economic Association and a pioneer in developing econometric methods for addressing the effect of technological change on product prices. In my academic advising role, I often participate in dissertation committees to assist students in a variety of fields (including technology management, economics, healthcare and operations management) on the empirical portions of their doctoral dissertations including empirical work on the automobile industry.

5. I have prior experience in litigation matters involving consumer class actions and valuation of consumer product attributes in a number of contexts. In the consumer class action *Kelley et al., v. Microsoft* (U.S. District Court, Western District of Washington, 2008), I was retained by Microsoft to evaluate whether consumers suffered economic injury as a result of Microsoft's alleged mislabeling of personal computers as being compatible with certain software. In another class action litigation (*In Re: Intel Laptop Battery Litigation*, U.S. District Court, Northern District of California, 2010) I was retained by Intel to evaluate the effect of technical benchmarks on consumer behavior in the laptop computer market. In a recent consumer class action regarding wet-dry vacuum cleaners (*In Re: Shop-Vac Marketing and Sales Practices Litigation*, U.S. District Court, Middle District of Pennsylvania, 2015) I was retained by Shop-Vac to evaluate the effect of an alleged mislabeling of a product attribute ("peak horsepower") on pricing and consumer choices. In *Avram v. Samsung Electronics America* (SEA) (U.S. District Court for the State of New Jersey, 2015), I was retained by SEA to analyze the effect of the Energy Star designation on the prices and demand for refrigerators. I also served as an expert witness in an antitrust class action which involved evaluating how competition, consumer behavior and retailer behavior affects firms' incentives to participate in an alleged price fixing conspiracy and the effect of such conspiracy on consumer prices (*In re: TFT-LCD (Flat Panel) Antitrust Litigation*, U.S. District Court, Northern District of California, 2011-2016). In addition to class actions, a number of my prior engagements involved evaluating the relationship between product features and pricing in differentiated products (*St. Clair Intellectual Property Consultants v. Acer Inc. et al.*, U.S. District Court, District of Delaware, 2012; *Round Rock Research v. Sandisk, Inc.*, U.S. District Court, District of Delaware, 2014; *Caltech v. Echostar*, U.S. District Court, Central District of

California, 2015; *Implicit Networks v. Juniper Networks*, U.S. District Court, Northern District of California, 2012; *Stragent v. Intel*, U.S. District Court, Eastern District of Texas, 2013; *Wisconsin Alumni Research Fund (WARF) v. Apple, Inc.*, U.S. District Court, Western District of Wisconsin, 2015; *Go Computer vs. Microsoft*, Superior Court of the State of California for the City and County of San Francisco, 2015).

6. My Curriculum Vitae is attached as Exhibit 1 and a list of my testimony in the past four years is attached as Exhibit 2. I am being compensated at a rate of $750 per hour. I am being assisted in this matter by staff at Cornerstone Research who are working at my direction. I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter. Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent on the content of my opinion or the outcome of this or any other matter.

## II. BACKGROUND, SUMMARY OF ALLEGATIONS, AND ASSIGNMENT

7. Defendant Mercedes-Benz USA ("MBUSA") is the distributor and warrantor of Mercedes-Benz vehicles in the United States.[2] Plaintiff claims that all Mercedes-Benz M-Class model years 2000 to 2007, R-Class model years 2006 and 2007, and GL-Class model year 2007 ("Class Vehicles") allegedly shared a common defect relating to the seat heaters in these vehicles.[3]

[2] According to MBUSA's Google Plus official page, the company "is responsible for the distribution, marketing and customer service for all Mercedes-Benz and Maybach products – including Mercedes-AMG vehicles – in the United States." "Official Mercedes-Benz USA Google+ Page" (https://plus.google.com/+mbusa/about).

[3] Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's Motion for Class Certification and for Appointment of Class Counsel, Case No.

8. Plaintiff's theory of injury is based on the diminution in market value of the Class Vehicles that would have occurred had the alleged seat heater defect been disclosed to consumers at the time of sale.[4] In his Motion for Class Certification, Plaintiff defines the Class as everyone "who purchased a new or certified pre-owned Mercedes Benz SUV Class Vehicle with a seat heater from an MBUSA authorized dealer in the State of California."[5]

9. Plaintiff submitted declarations by Ramamirtham Sukumar ("Dr. Sukumar") and Bruce McFarlane ("Mr. McFarlane") who were tasked with determining "what effect, if any, the disclosure of the seat heater problem would have had on the *market value* of the SUV Class Vehicles at the time of sale."[6] Both Dr. Sukumar and Mr. McFarlane in their declarations describe this "market value" as the "market price determined by demand and supply."[7]

---

8:14-cv-02011-JVS, May 31, 2016 ("Plaintiff's Motion for Class Certification"), pp. 2, 5–7.

[4] "As a direct and proximate result of the Safety Defect and Defendants' concealment and nondisclosure of the Safety Defect, Plaintiffs (1) overpaid for the vehicle; (2) did not receive the benefit of their bargain; (3) received a vehicle which due to the Safety Defect presents a foreseeable risk of physical injury not known to Plaintiffs until May 24, 2014 at the earliest; (d) suffered a loss of usefulness of their vehicle in that they no longer use the seat heaters in the vehicle given the safety issues associated with such use; (5) suffered injury in fact; and (6) lost money or property." Second Amended Class Action Complaint, Case No. 8:14-cv-02011 JVS, June 8, 2015, p. 5. *See* also Declaration of Bruce McFarlane in Support of Plaintiff's Motion for Class Certification filed on May 31, 2016 ("McFarlane Declaration"), ¶6.

[5] "The class period is from January 2000 to the present." Plaintiff's Motion for Class Certification, p. 2.

[6] Plaintiff's Motion for Class Certification, pp. 9–10. Emphasis added.

[7] McFarlane Declaration, ¶15; Declaration of Ramamirtham Sukumar, Ph.D. in Support of Plaintiff's Motion for Class Certification filed on May 31, 2016 ("Sukumar Declaration"), footnote 2.

10. I was retained by counsel for MBUSA to review and respond to the analyses put forward by Plaintiff's experts, Dr. Sukumar and Mr. McFarlane. I was also asked to assess whether the claimed economic injury (a reduction in the market price of all Class Vehicles had the alleged defect been disclosed at the time of sale) can be determined using a common method applicable to all putative class members.

11. In reaching my opinions, I have reviewed legal briefs and pleadings, discovery documents, Declarations of Mr. McFarlane and Dr. Sukumar and the materials referenced therein, deposition transcripts of Mr. McFarlane and Dr. Sukumar, and academic and trade literature, among others. In addition, I have reviewed Defendant's expert Professor Olivier Toubia's Declaration (the "Toubia Declaration").[8] A list of the materials I have relied on in forming my opinions is attached as Exhibit 3.

12. My work is ongoing, and I reserve the right to supplement my opinions as new information becomes available during the course of this litigation.

## III. SUMMARY OF CONCLUSIONS

13. I conclude that the analysis of Plaintiff's experts, Dr. Sukumar and Mr. McFarlane, violates fundamental principles of economics in numerous ways and does not—and cannot—reliably estimate or measure the effect of a "safety risk" disclosure by MBUSA on market prices of Class Vehicles. According to basic economic principles, a market price is an equilibrium price arising from the interaction between buyers (demand) and manufacturers and intermediaries (supply) in a well-defined market. Plaintiff's experts have not conducted a proper market analysis using reliable methods that would be acceptable in the field of

[8] Declaration of Professor Olivier Toubia filed on August 9, 2016 ("Toubia Declaration").

economics to estimate a market price, because (among other reasons) they (1) did not define the relevant market, (2) assumed away factors on the supply side of the market entirely, (3) did not properly account for demand-side factors, and (4) ignored any competitive reaction to MBUSA's hypothetical "safety risk" disclosure. Such a treatment of supply-side factors and competition in a market analysis is fundamentally flawed, and would never be accepted in economics as a valid way to estimate a market price.

14. Moreover, the specific formula Dr. Sukumar uses for his conjoint analysis, "Formula 14," cannot estimate a market price because it does not take account anything except some of the demand-side factors, and does so deficiently as it is based on an internet survey presenting a fictitious, hypothetical scenario that is inconsistent with real-world market conditions and consumer behavior. This methodology would not be—and to my knowledge never has been—accepted as an estimate of market price in any peer-reviewed economics journal. In fact, the academic literature makes clear that Dr. Sukumar's methodology does not reflect market prices.[9]

15. Indeed, given the complexity of the automobile market—dozens of competitors, hundreds of products, and thousands of product features, all of which have been changing over the 16-year class period that the Class Vehicles have been sold or resold—it would be impossible to reliably estimate the influence of any disclosure on market prices for Class Vehicles using a common method. According to the academic literature and facts in this case, the factors that affect supply and

---

[9] Allenby, G. M., J. D. Brazell, J. R. Howell, and P. E. Rossi (2014), "Valuation of Patented Product Features," *Journal of Law and Economics*, 57(3), 629–663; Allenby, G. M., J. D. Brazell, J. R. Howell, and P. E. Rossi (2014), "Economic Valuation of Product Features," *Quantitative Marketing and Economics*, 12(4), 421–456.

demand in the U.S. automobile market differ from consumer to consumer and from transaction to transaction, causing the transaction price—and hence the price effect of a "safety risk" disclosure, if any—to vary from transaction to transaction. The opinion of plaintiff's experts, that there would be a common market-price discount of $609 for all Class Vehicle purchase transactions over a 16-year period, is based on nothing more than an assumption without any empirical or factual basis.

16. In fact, after removing Dr. Sukumar's arbitrary constraints in the analysis of results from the highly simplified hypothetical choice setting used in Dr. Sukumar's survey, the responses indicate that many consumers would not have demanded *any price discount* based on a seat-heater "safety risk" disclosure, and thus would have no "overpayment" injury at all. That is, Dr. Sukumar's survey results, as well as the facts of the case and economic realities of the automobile market, show the disclosure at issue would not have had a common impact on market prices for Class Vehicles.

17. Plaintiff's theory of damages would also unduly assign multiple damages compensation for the same vehicle. According to Plaintiff's theory, the $609 reduction in market price, or the "Discount" calculated by Dr. Sukumar, should equally apply to the sales prices of new and used vehicles. However, in Plaintiff's "but-for" world, a consumer who purchased a new vehicle with the disclosure may have paid $609 less, but would also have received $609 less upon resale or trade; or, in real world terms, class members might have "overpaid" for Class Vehicles by $609 at the time of purchase, but they would have been "overpaid" by the same amount upon resale or trade since (according to Plaintiff's theory) no purchaser received a disclosure. Therefore, the discount/overpayment would simply cancel out for each intermediate owner (including the first one),

except for the final owners. As a result, Plaintiff's theory would wrongfully assign damages compensation to all intermediary purchasers of the same vehicle.

18. Lastly, Dr. Sukumar's model is not reliable and is not consistent with Plaintiff's theory of injury because it is not able to determine a monetary discount that is related to the extent of the alleged "defect" as it is defined by the Plaintiff. Specifically, the stated probability of manifestation of the defect in Dr. Sukumar's survey (seat heater with "1/100 chance of safety risk") and the task of comparing this defective seat heater to a "perfect" seat (one without any "safety risk") are neither consistent with the facts of the case, nor do they reflect choices consumers would face in the real world. Dr. Sukumar's claim, without any foundation, that the probability of a defect manifestation does not matter to consumers, and his admission that the results of his survey and the $609 Discount he calculates would not materially change if the probability of manifestation of the seat heater "safety risk" he presents to the respondents was 1 in 5, 1 in 10, 1 in 100, or 1 in 1 million[10] suggest that his analysis and findings are divorced from reality and lack validity and reliability.

19. Moreover, if one were to accept as true Dr. Sukumar's claim that the Discount would not materially change in response to changes in the probability of the alleged defect, this implies that Dr. Sukumar's model would assign roughly the *same* Discount to purchasers of Mercedes-Benz vehicle models which are *not* among the Class Vehicles but have probabilities of seat heater malfunction between 1 in 100 and 1 in 1 million per Mr. McFarlane's incidence rate calculations, and

---

[10] Deposition of Ramamirtham Sukumar on June 22, 2016 ("Sukumar Deposition"), pp. 117–120.

which according to Plaintiff's theory of injury, *do not have a "defect*."[11] This further demonstrates that Dr. Sukumar's analysis and findings are highly flawed.

## IV. SUMMARY OF SUKUMAR AND MCFARLANE DECLARATIONS

### A. Sukumar Declaration

20. Dr. Sukumar conducted a choice based conjoint survey over the Internet to determine the difference in value, if any, customers placed on a seat heater with a 1/100 chance of a "safety risk" occurring compared to a seat heater without any "safety risk"[12] In the survey, Dr. Sukumar defined the "safety risk" as "seat heater would overheat to a point that the driver will smell the burning of the seat material or see smoke inside the vehicle or it will burn a hole through the upholstery or burn a hole through your clothing while driving,"[13] and asked respondents to make repeated choices among different packages of features and prices in an effort to collect data that characterizes consumer preferences.[14]

21. Dr. Sukumar placed the survey data into a statistical model using an off-the-shelf software package in order to estimate the effect of these features on product choice.[15] These figures were then entered into a formula (which he

---

[11] Based on the calculations provided by Mr. McFarlane, many non-Class Vehicles have an incidence rate that is between 1 in 100 and 1 in 1 million. *See* McFarlane Declaration ¶38, Figure 7. Plaintiff's theory of liability is based on the presence of an alleged "design defect" only in certain Mercedes-Benz SUV-Class vehicles, which are included in Plaintiff's proposed class definition: "the design defect exists in the SUV Class Vehicles as opposed to other models and years." Plaintiff's Motion for Class Certification, p.7.

[12] Sukumar Declaration, ¶¶19–20.

[13] Sukumar Declaration, Exhibit 3, p. 21.

[14] Sukumar Declaration, Exhibit 3.

[15] "CBC Hierarchical Bayes Module," Sawtooth Software (http://www.sawtoothsoftware.com/products/advanced-analytical-tools/cbc-hierarchical-bayes-module).

describes as "Formula 14") that Dr. Sukumar claims converts the results of the conjoint study into an estimate of the reduction in "market price" needed to keep the same amount of sales if MBUSA disclosed the "safety risk" at the time of the sale—all else remaining the same.[16] Dr. Sukumar refers to this estimate of market-price reduction as the "Discount."[17]

22. Dr. Sukumar claims his results indicate that the disclosure of a 1/100 chance of overheating and a "safety risk" occurring at the time of sale would have reduced the "market price" of every Class Vehicle by approximately $609.[18]

**B. McFarlane Declaration**

23. Mr. McFarlane opines that what Dr. Sukumar measures is not simply willingness to pay ("WTP")—which is what conjoint analysis typically measures—for a non-defective seat heater, but rather a change in market prices.[19] In particular, Mr. McFarlane opines that the $609 Discount calculated by Dr. Sukumar factors in both the consumers' WTP and the sellers' willingness to sell at the reduced market price given the "safety risk" disclosure to consumers.[20] To substantiate his claim regarding willingness to sell, Mr. McFarlane analyzed MBUSA's grandparent company Daimler AG's average profit per new vehicle in 2000 – 2014 using Daimler AG's annual reports (and using worldwide sales and profitability data for Daimler AG rather than sales and profitability data for MBUSA).[21] He claims these

---

[16] Sukumar Declaration, ¶¶19–20.
[17] Sukumar Declaration, ¶¶19–20.
[18] Sukumar Declaration, ¶¶20, 54.
[19] McFarlane Declaration, ¶¶16, 19.
[20] McFarlane Declaration, ¶35.
[21] McFarlane Declaration, ¶24.

data indicate that Daimler AG's profit per vehicle is greater than $609 and therefore MBUSA would be willing to sell Class Vehicles at these reduced prices.[22]

24. Mr. McFarlane also determined "the rate of incidence that Mercedes Benz cars sold in the U.S. incurred warranty repairs related to seat heaters" by model and year.[23] According to Mr. McFarlane's results, this "rate of incidence" ranges from 0.8% to 10.8%.[24]

## V. THE METHODOLOGY RELIED ON BY PLAINTIFF CANNOT DETERMINE EQUILIBRIUM MARKET PRICES BECAUSE PLAINTIFF'S EXPERTS DO NOT PROPERLY DEFINE THE MARKET, FAIL TO ACCOUNT FOR SUPPLY FACTORS, AND RELY SOLELY ON SOME OF THE DEMAND-SIDE FACTORS

25. The interaction between supply and demand in the relevant market determines the prices that prevail in that market—these are often referred to as equilibrium prices because they represent the outcome after all market participants make their optimal choices (prices and product design for producers; product choices for consumers) and have no incentive to deviate from such choices.[25] The analysis put forward by Plaintiff's experts cannot determine the effect of a "safety

---

[22] McFarlane Declaration, ¶¶23–28.
[23] McFarlane Declaration, ¶36.
[24] McFarlane Declaration, ¶38; McFarlane Declaration, Figure 7.
[25] Supply in the market is determined by characteristics of the competitors as well as characteristics of the market, such as the available technology, cost of production, market structure, and competitive positions. Demand in the market is determined by characteristics of consumers such as their preferences over the focal product (e.g., a Mercedes-Benz vehicle) and other substitute products, as well as information conditions, such as a consumer's knowledge of available products and prices. *See*, e.g., chapters 1–5, 13, 16, 18 in Varian, H. R. (1992), *Microeconomic Analysis.* New York: W. W. Norton & Company ("Varian (1992)"); and Part II ("Strategic Interaction") in Tirole, J. (1988), *The Theory of Industrial Organization.* Cambridge, MA: The MIT Press.

risk" disclosure on market prices because it does not consider all of the supply and demand factors needed to do a proper market analysis.[26]

26. In particular, Plaintiff's experts have not provided a proper and consistent definition of the market, they have not fully characterized demand for Class Vehicles, and they have not conducted any meaningful analysis of supply behavior. Nor can the application of "Formula 14," which takes as its input only some of the demand factors, convert an entirely demand-side analysis into a market price for Class Vehicles. Plaintiff's experts' analysis is, at best, limited to a partial analysis of demand behavior for a set of consumers that does not reflect the actual market, and therefore cannot yield a market price for Class Vehicles.

27. The focus on a "market price" is not simply a matter of terminology—the existence of a common change in market price for all Class Vehicles is essential to Plaintiff's argument for common impact since, if the hypothetical disclosure about the alleged defect does not influence the equilibrium market price for all relevant vehicles sold over the relevant period in exactly the same way, then the actual harm, if any, would need to be determined using a methodology that focuses

[26] Except for commodity markets traded in centralized or coordinated exchanges (e.g., specific grades of crude oil or wheat), at any given time in a given market multiple prices will typically prevail due to variations in product characteristics. Price dispersion or the variation in market prices for identical products—even at the same point in time—can also be a result of market imperfections such as presence of search costs and information asymmetries. For a detailed discussion of the economics of price dispersion, *see* Baye, M. R., J. Morgan, and P. Scholten (2006), "Information, Search, and Price Dispersion," in *Handbook on Economics and Information Systems*, T. Hendershott, ed. Amsterdam: Elsevier. Search costs and other market imperfections are known to play a role in automobile markets as well, even at the wholesale level. *See*, e.g., Genesove, D. (1993), "Adverse Selection in the Wholesale Used Car Market," *Journal of Political Economy*, 101(4), 644–665.

on changes in prices paid by each individual in each specific transaction due to the challenged conduct (in other words, it would require individualized inquiry).

### A. Plaintiff's Experts Do Not Properly Define the Relevant Market

28. A complete analysis of equilibrium market prices begins with a proper market definition, or the definition of the relevant product and geographic markets.[27] Product markets are typically defined as a collection of products that are substitutes such that a change in the price of one product leads to a change in the demand for other substitute products. Identification of the product market therefore enables the identification of competitors and intermediaries who produce and/or distribute these products (for analysis of supply) and the identification of consumers who would potentially purchase these products (for analysis of demand). Market boundaries can be influenced by both consumer preferences and producer production capabilities as well as other factors such as geography, especially for products (like automobiles) where transportation costs are significant, and there may be regional variations in preferences or production costs.[28]

---

[27] The practice of defining market boundaries is perhaps most developed for merger and anti-trust analysis. For a detailed discussion of market definitions, *see* "Horizontal Merger Guidelines," *Department of Justice and Federal Trade Commission*, August 19, 2010 ("Horizontal Merger Guidelines (2010)"), pp. 7-14 (https://www.ftc.gov/sites/default/files/attachments/merger-review/100819hmg.pdf).

[28] The geographic dimension is particularly relevant for the automobile markets. For example, Albuquerque and Bronnenberg (2011) find that "[w]hen deciding where to buy a car…consumers dislike travel distance to car dealerships," and "the majority of demand of a car dealership originates from consumers located in close proximity." Albuquerque, P., and B. J. Bronnenberg (2011), "Measuring the Impact of Negative Demand Shocks on Car Dealer Networks," *Marketing Science*, 31(1), 4–23, at p. 5. Furthermore, Overby and Forman (2014) find that "there is a limit to how 'remotely' buyers will purchase because they must pay to transport vehicles to their locations." *See* Overby, E., and C. Forman (2015), "The Effect of

29. Neither Mr. McFarlane nor Dr. Sukumar presents a formal definition of the relevant market. In fact, depending on the issue, Dr. Sukumar offers differing and inconsistent groups of products and consumers for his analysis and completely ignores the geographic scope of the relevant market. For instance, Dr. Sukumar at various stages in his report or deposition testimony suggests that the relevant group for his analysis is low-end vehicles (when discussing his assumption of no competitive price reaction to the disclosure);[29] Mercedes-Benz and BMW (when asked at deposition about competitor prices he reviewed);[30] Mercedes-Benz, BMW, Jaguar, or "something else" (when discussing competitors he "controlled for" in his analysis);[31] consumers who have purchased or are likely to buy a Mercedes-Benz vehicle (when asked at deposition to define the relevant market in this case);[32] purchasers, MBUSA and Mercedes-Benz dealers (when asked in deposition whether the market extends beyond purchasers);[33] or the respondents to the survey itself (when discussing the market to which his conjoint calculation applies).[34] None of the groups of products or consumers considered by Dr. Sukumar provide a reasonable or well-defined market definition that could be the basis for a market analysis because they do not consider the extent to which products are substitutes.[35]

---

Electronic Commerce on Geographic Purchasing Patterns and Price Dispersion," *Management Science*, 61(2), 431–453 ("Overby and Forman (2015)"), at p. 443.

[29] Sukumar Declaration, ¶48.

[30] Sukumar Deposition, pp. 81–82.

[31] Sukumar Deposition, pp. 79–80.

[32] Sukumar Deposition, p. 77.

[33] Sukumar Deposition, p. 78.

[34] Sukumar Deposition, pp. 88–89.

[35] *See* Horizontal Merger Guidelines (2010) for a detailed discussion of market definitions.

30. Furthermore, Dr. Sukumar's differing and conflicting groups of products and consumers he considers for his analysis—flawed as they are—completely ignore the geographic scope of the relevant market. The geographic scope of the automobile market can be local as consumers often search for vehicles within the confines of a geographical area, and it is the supply and demand conditions in that geography that determine the transaction price paid by a particular consumer. The supply and demand factors can vary significantly across different geographical areas, resulting in significant variation in transaction prices across different regions.[36] Plaintiff's experts account for none of this.

31. The lack of any attempt by Plaintiff's experts to define the relevant market for the basis of competition analysis, and their differing and inconsistent definitions, offer clear evidence that Plaintiff's experts did not conduct a proper *market* analysis and, therefore, cannot measure or estimate *market* prices and changes in these prices due to the challenged conduct.

### B. Plaintiff's Experts' Claim that They Considered Supply Factors is False—They Improperly Assumed Supply Factors Out of Their Analysis

32. Plaintiff's experts incorrectly claim to have considered supply factors, but in reality they simply adopt untested and patently unreasonable assumptions about supply that have no valid scientific basis. Specifically, Dr. Sukumar's

[36] For example, "geographic price dispersion may exist if prices for vehicles… are consistently higher at some facilities than at others due to persistent imbalances in supply and demand across facilities. It may also exist if prices are not consistently higher at some facilities but instead vary week to week due to fluctuating imbalances in supply and demand." Overby and Forman (2015), p. 435. The authors also find that "there is a limit to how 'remotely' buyers will purchase because they must pay to transport vehicles to their locations… The cost of transporting vehicles also means that geographic price dispersion will never be zero." Overby and Forman (2015), p. 443.

analysis simply assumes no relevant supply considerations would change as a result of the hypothetical "safety risk" disclosure. According to Dr. Sukumar's deposition testimony, such an assumption is justified because "[o]therwise, you have confounding factors and you want to wipe that confounding. That's really what we're doing out here."[37] In other words, Dr. Sukumar admits that, since accounting for all of the factors that influence equilibrium market prices in the real market would render his analysis too complicated or even impossible (i.e., "confounding"), he arbitrarily assumes that these factors simply do not matter. This does not reflect a scientifically sound or generally accepted methodology for determining or estimating actual market prices.

33. Mr. McFarlane then attempts to justify Dr. Sukumar's assumptions by arguing that Daimler AG (MBUSA's grandparent company) reported an overall profit during certain years within the class period.[38] This has no relation to changes in supply factors, does not justify Dr. Sukumar's supply-side assumptions, and does not follow any recognized or accepted methodology for assessing market prices.

34. Simply put, Plaintiff's experts completely omit the supply side of the market, rendering their analysis at best, an (incomplete) measurement of demand. Such an analysis *cannot* yield an equilibrium market price.

#### 1. There Is No Basis for the Assumption That Competition Would Not React

35. Dr. Sukumar admits his analysis does not account for any possible competitive reaction to a disclosure by MBUSA of the alleged "safety risk" and the impact, if any, of the competitive reaction on the "market price" Discount he

[37] Sukumar Deposition, p. 94.
[38] McFarlane Declaration, ¶¶24–27; McFarlane Declaration, Figure 4.

calculates.[39] Rather, Dr. Sukumar merely assumes there would be no competitive response. This is contrary to both basic economic theory and the realities of the automobile market. Indeed, Dr. Sukumar's assumption of lack of competitive response is inconsistent with arguments made by Plaintiff's other expert, Mr. McFarlane, as well as the authors of the paper that Dr. Sukumar uses for his Formula 14. Mr. McFarlane testified that MBUSA operates "in a very competitive market space,"[40] which as a matter of economics would suggest some reaction by Mercedes-Benz's competitors. And Ofek and Srinivasan (the authors of the Formula 14 paper) recognize that, even in presence of an infinitesimal change in a product attribute, "it is more realistic to assume that competitors will, in fact, react by adjusting their own prices," and that "competitors may react by changing multiple attributes."[41]

36. By not allowing for competitive reactions to MBUSA's hypothetical disclosure regarding the alleged "safety risk," Dr. Sukumar's study fails as a proper market analysis of his but-for world scenario and cannot deliver an estimate of the change in equilibrium market price in such a setting or determine whether or not the change is the same across products.

37. Dr. Sukumar's assumption regarding lack of competitive response to the hypothetical "safety risk" disclosure is based purely on his unsupported belief, without any analysis, that Mercedes-Benz consumers are "extremely loyal," and

---

[39] Sukumar Deposition, pp. 92–93, 97–99.

[40] Deposition of Bruce McFarlane on June 23, 2016 ("McFarlane Deposition"), p. 109.

[41] Ofek, E. and V. Srinivasan (2002), "How Much Does the Market Value an Improvement in a Product Attribute?," *Marketing Science*, (21)4, 398–411 ("Ofek and Srinivasan (2002)"), at pp. 407, 409.

that the value of the seat heater attribute is "small."[42] For several reasons, this is not a justification for claiming a purely demand-side analysis is really a market analysis.

38. First, Dr. Sukumar has not done any analysis to determine the extent of Mercedes-Benz brand loyalty and how this would influence consumer choice of products or their response to the disclosure of any alleged defect. He therefore has no basis to determine whether the strength of Mercedes-Benz brand loyalty is sufficient to prevent any viable competitive response.

39. Second, Dr. Sukumar ignores the implications of his assumed high degree of brand loyalty that contradict his conclusions. In particular, "extremely loyal" customers may value the Mercedes-Benz brand sufficiently highly that factors such as a potential seat heater defect disclosure would not alter purchase behavior. This would reduce or eliminate any discount associated with the disclosures of the alleged seat heater defect. It is scientifically invalid for Dr. Sukumar to argue that brand loyalty is sufficiently large to affect competitive response without accounting for brand loyalty in his analysis of the discount, which he does not do.

40. Moreover, Dr. Sukumar's assumption regarding lack of any competitive reaction to MBUSA's disclosure can seriously bias his results and inflate the discount estimated with Formula 14. In fact, as acknowledged by Dr. Sukumar himself, "[i]n a market where products compete on price, the Discount can theoretically be upwardly biased."[43] Dr. Sukumar, however, assumes that the upward bias in his discount calculation is "minimal," because "[p]ricing is stable in the market for Mercedes vehicles" and Mercedes-Benz "does not compete with

---

[42] Sukumar Deposition, pp. 96–98.

[43] Sukumar Declaration, ¶48.

other lower-end vehicles on price."[44] Dr. Sukumar's assertions have no basis since without a proper definition of the relevant market, and without a proper market analysis, it is not possible to draw any conclusions on the type of competition faced by MBUSA and on how MBUSA operates in its relevant market. As a consequence, Dr. Sukumar cannot assume that his calculations are not biased and inflated and, most importantly, he cannot and does not measure the size of such bias. All of this renders Dr. Sukumar's discount inaccurate and unreliable.

**2. Contrary to Plaintiff's Experts Assumptions, the Supply of Class Vehicles is Not Constant**

41. The next untested and unreasonable assumption Dr. Sukumar and Mr. McFarlane make about supply factors is that MBUSA would have a fixed inventory of vehicles with allegedly defective seat heaters, without any opportunity to adjust the number of vehicles supplied over the class period.[45] There is no valid, scientific basis for this assumption. In fact, it is contrary to fundamental economic theory.

42. Plaintiff's experts assume that supply of Class Vehicles is fixed (even though the supply at issue covers vehicles produced over multiple years), and therefore the only choice available to MBUSA upon disclosure of the alleged defect is to change vehicle prices to "liquidate" this fixed supply of vehicles.[46] This is inconsistent with the standard economic model of producer behavior which states that firms can adjust the quantity supplied to adapt to any changes in market conditions (supply, demand, or competitors' actions) to maximize their

---

[44] Sukumar Declaration, ¶48.

[45] Note again that MBUSA is the distributor and marketer of Mercedes-Benz products in the United States whereas Daimler AG is the manufacturer of these products. *See* footnote 2.

[46] *See*, e.g., Sukumar Deposition, pp. 72, 87, 248–251; McFarlane Deposition, pp. 122, 124.

profitability.[47] Following the standard model of producer behavior, MBUSA's optimal quantity supplied would then be determined by the profitability of the marginal vehicles sold in the event of a hypothetical decrease of class vehicle prices by $609. Plaintiff's experts do not provide any analysis of MBUSA's fixed, variable, or marginal costs during the class period, hence they do not know whether a discount of $609 would have actually impacted MBUSA's profit-maximizing quantity supplied. In other words, Dr. Sukumar and Mr. McFarlane do not perform any analysis of MBUSA's (and dealers') willingness to sell but *simply assume* that, after a hypothetical disclosure, the only choice MBUSA and dealers would have made is selling a fixed inventory of Class Vehicles over multiple years at prices reduced by the discount calculated by Dr. Sukumar. To the contrary, MBUSA could have taken one of several possible decisions that would be more profitable than cutting vehicle prices, such as marketing other optional features more heavily than seat heaters.

### 3. Mr. McFarlane's "Profits" Analysis is Fundamentally Flawed, Inconsistent with Standard Economic Model of Producer Behavior, and Does Not Validate Dr. Sukumar's Fixed Supply Assumption

43. Mr. McFarlane's analysis—which attempts to justify Dr. Sukumar's assumption that the number of units sold by MBUSA over the class period would remain constant had the market price decreased as a result of MBUSA's disclosure—also violates the standard economic model of producer behavior.[48] Specifically, Mr. McFarlane calculates MBUSA's grandparent company Daimler AG's *average profit* per new vehicle sold in the years 2000-2015 and, after subtracting $609 from this average profit measure, contends that MBUSA (as

[47] *See*, e.g., Varian (1992), pp. 24–25.
[48] McFarlane Declaration, ¶¶22–23.

opposed to Daimler AG) would still make a profit on these vehicles.[49] Mr. McFarlane then concludes that MBUSA would have sold the same number of new vehicles in response to a lower price, because Daimler AG would have incurred positive average profits on the same quantity sold.[50]

44. Even hypothetically assuming that Mr. McFarlane can use Daimler AG's average profitability as a reasonable proxy for MBUSA's average profitability for Class Vehicles (which he cannot), Mr. McFarlane's analysis is inconsistent with basic economics because it rules out the possibility that MBUSA's optimal, profit-maximizing supply quantity might change after the $609 reduction in vehicle sales prices. According to the standard economic model of producer behavior, production decisions are based on marginal rather than average profitability.[51] Positive average profits after accounting for a reduction of $609 do not imply that the underlying quantity supplied is the profit-maximizing quantity for the firm (i.e., average profits can be even higher with a different quantity supplied). Thus, Mr. McFarlane conflates average profitability with marginal profitability to reach the erroneous conclusion that supply would remain fixed even if it could actually be adjusted.[52]

---

[49] McFarlane Declaration, ¶¶24–28.

[50] McFarlane Declaration, ¶¶22–28.

[51] Marginal and average profitability are only loosely connected. Generally, higher marginal profits on each unit will lead to higher overall average profits. However, at optimal production, average profits will typically be positive while marginal profits are zero. If production exceeds the optimal quantity, average profits will decline, possibly to zero, but the rate of decline and the quantity increase needed to reach a zero-profit condition cannot be determined without knowing the full relationship between quantity, cost, and demand.

[52] McFarlane Declaration, ¶22.

45. Besides being uninformative on MBUSA's optimal supply decisions in case of a "safety risk" disclosure and providing no legitimate analysis of supply factors, Mr. McFarlane's analysis of average profits also contains several flaws that render it unreliable. First, Mr. McFarlane admits that the average new vehicle profit he calculated for MBUSA is actually the average profit from worldwide sales of new vehicles for Daimler AG.[53] In other words, the data that Mr. McFarlane analyzed represent average profit for *all* new vehicles sold *worldwide* by *Daimler AG*, and hence does not represent MBUSA's— the relevant decision-maker in the supply of Class Vehicles in the U.S.—average profits from sales of new vehicles (let alone sales of new Class Vehicles) in the U.S. The average profit Mr. McFarlane calculates includes many types of vehicles (e.g., non-class Mercedes-Benz SUVs and cars, Mercedes-Benz vans, buses, and trucks sold under other Daimler AG brands), and many brands and sub-brands (e.g., Maybach, Smart Car, Mercedes Me, Freightliner, FUSO, Setra) in addition to Class Vehicles and non-US sales of Mercedes-Benz and other branded vehicles.[54] As a consequence, Mr. McFarlane's analysis cannot yield *MBUSA's* average profits on Class Vehicles, let alone generate any meaningful insights about how *MBUSA's* average profits on Class Vehicles would be affected by a hypothetical disclosure.

46. Second, even assuming Mr. McFarlane could successfully calculate MBUSA's average profits on new Class Vehicles by focusing on average profits across all new Class Vehicles (he cannot), Mr. McFarlane's analysis would obscure any differences in profitability of different models of new Class Vehicles. There is

[53] McFarlane Deposition, pp. 152, 155–158.

[54] For a list of Daimler AG's current sub-brands, *see* "Our Products," Daimler (https://www.daimler.com/products/). For a list of countries in which Daimler AG currently operates, *see* "Locations Overview," Daimler (https://www.daimler.com/career/job-search/locations/).

no reasonable basis for Mr. McFarlane to assume that profitability across different models of new Class Vehicles would be the same. In fact it is possible that a $609 discount would produce negative average profits on some new Class Vehicles as opposed to others. Mr. McFarlane cannot ascertain the impact of a $609 discount on different models of new Class Vehicles, and therefore has no valid basis to assume that MBUSA's willingness to sell would have been the same for all models included within the putative class.[55]

47. Finally, Mr. McFarlane's analysis does not consider at all the profitability of certified pre-owned ("CPO") Class Vehicles. As a matter of fact, CPO vehicles are independently sold by Mercedes-Benz dealers, and MBUSA does *not* sell and therefore earn any profit off the sale of any CPO vehicles.[56] As Mr. McFarlane admits, "in terms of Mercedes' willingness to sell cars … [Mercedes] has no control to constrain the sale of [CPO vehicles]. So the willingness to sell is an irrelevant concept for those subsequent downstream cars. Mercedes can't control that."[57] Thus, any analysis of MBUSA's willingness to sell CPO vehicles is pointless because *dealers*, not MBUSA, are the relevant decision makers for the supply of CPO vehicles. Mr. McFarlane also has no information regarding profits of Mercedes-Benz dealers from the sale of CPO Class Vehicles (which would require individualized inquiry),[58] and he does not attempt to analyze how dealers'

---

[55] McFarlane Deposition, pp. 188–189.

[56] MBUSA provides the warranty on CPO vehicles, and dealers are charged for the cost of the warranty. *See* Mercedes-Benz USA, LLC's Supplemental Responses to Plaintiff William S. Callaway's Third Set of Interrogatories, July 1, 2016 ("MBUSA Interrogatories"), pp. 2–3. When Mr. McFarlane was asked during his deposition whether he is aware of this fact, he stated that he did not know. McFarlane Deposition, pp. 215–216.

[57] McFarlane Deposition, pp. 105–106.

[58] McFarlane Deposition, pp. 226–229, 231–232.

willingness to sell CPO vehicles would change after MBUSA's disclosure of the alleged defect.

### C. Application of "Formula 14" Does Not Yield a Market Price

48. Dr. Sukumar attempts to estimate the impact of the hypothetical "safety risk" disclosure on market price using a specific application of conjoint methodology, Formula 14, as published in a 2002 paper by Ofek and Srinivasan.[59] Although the Ofek and Srinivasan paper uses the phrase "market value," this is *not* a market price as it would be conventionally defined in economics—that is, a price one would actually observe in a real market representing the actual interaction between real firms, intermediaries, and consumers. As stated in Ofek and Srinivasan (2002), the "market value" estimated by Formula 14—and which Dr. Sukumar purports to calculate in this case—"reflects aggregate *demand* sensitivity for the incremental attribute and price changes."[60] It does not incorporate any supply factors and a proper analysis of the competition in the relevant market. Furthermore, Dr. Sukumar admits in his testimony that the "discount" he calculates with the application of Formula 14 would reflect, at best, only "the discount that the market would *demand*" if the alleged safety risk was disclosed.[61] How such a demand would translate into a market price depends on the interactions between buyers, intermediaries, and sellers—which vary from transaction to transaction—which Dr. Sukumar left unspecified in his analysis.[62] While both Dr. Sukumar and

---

[59] Ofek and Srinivasan (2002), pp. 398–411.

[60] Ofek and Srinivasan (2002), p. 401. Emphasis added.

[61] Sukumar Deposition, pp. 113, 157–158, 163, 166–167, 177, 191, 220. Emphasis added.

[62] As explained more fully in Toubia Declaration, the so-called Formula 14 on which Dr. Sukumar relies was developed as a theoretical way to estimate the market value of "infinitesimal" changes to product attributes, assuming no changes to supply-side factors. Toubia Declaration, ¶¶24–33. This formula is not

Mr. McFarlane state that there is no difference between this market value and market price, Dr. Sukumar later in his deposition (correctly in my opinion) observes that the market value he purports to calculate is *not* the same as the price that would actually prevail.[63]

49. Subsequent published papers reinforce this point: the methodology and the measure developed in Ofek and Srinivasan (2002) that Dr. Sukumar relies upon (i.e., Formula 14) is a simple willingness-to-pay or a demand measure when implemented correctly, not a market price. According to Allenby et al. (2014):

> Ofek and Srinivasan (2002) define the market's value for an attribute improvement as the amount by which a firm can raise the price when the feature is added to a product and still command the same market share. **This is a willingness-to-pay (WTP) measure and is not based on any market equilibrium computation**.[64]

50. Similarly, according to another 2014 paper by the same authors:

> In the marketing literature, Ofek and Srinivasan (2002) have considered the problem of what they term 'the market value of an attribute improvement (MVAI).' They define the MVAI for a feature enhancement as the increase in price that can be made to an enhanced product while keeping its share constant… This is similar to the 'market simulation' approach to computing WTP in the conjoint literature. However, **the MVAI measure does not consider the competitive response of other firms and is based exclusively on conjoint-derived demand**

---

applicable to the facts of this case because the product change Dr. Sukumar presented is not "infinitesimal" and, from an economic perspective, it is unreasonable to assume that there are no changes to supply-side factors.

[63] In particular, Dr. Sukumar states that "[m]arket price takes into account what the seller decides in terms of the supply that they have. It also takes into account the demand side … the market value is different from the market price that the seller decides to sell." Sukumar Deposition, pp. 34–35.

[64] Allenby, G. M., J. D. Brazell, J. R. Howell, and P. E. Rossi (2014), "Valuation of Patented Product Features," *Journal of Law and Economics*, 57(3), 629–663, at p. 647. Emphasis added.

> **parameters without any consideration of costs or a competitive equilibrium**. We believe that the economic value of a feature enhancement must be based on what profits a firm can earn on the enhanced product which is not measured by MVAI.[65]

51. After a diligent search, I found no academic article that uses conjoint analysis (including Formula 14) to derive an equilibrium market price (or changes to an equilibrium market price) associated with a vehicle, let alone a discount associated with an allegedly defective component part of a car.[66] Further, to my knowledge, no subsequent academic paper since the publication of Ofek and Srinivasan (2002) has demonstrated or verified that a calculation similar to the one Dr. Sukumar proposes via the application of Formula 14 actually measures changes to equilibrium market prices for any product features in the real-world. My own review and analysis of Formula 14 indicates that it is not a valid method for estimating changes in market prices in a differentiated product market, such as the automobile market, nor would it be accepted as such in the relevant scientific community.

52. In sum, although Dr. Sukumar and Mr. McFarlane claim that the estimates derived from the application of Formula 14 correspond to the decrease in equilibrium market prices for Class Vehicles in a but-for world in which MBUSA had disclosed the alleged seat heater defect at the time of purchase,[67] their analysis cannot deliver a change in market prices because it contains no information about

---

[65] Allenby, G. M., J. D. Brazell, J. R. Howell, and P. E. Rossi (2014), "Economic Valuation of Product Features," *Quantitative Marketing and Economics*, 12(4), 421–456, at p. 423. Emphasis added.

[66] I searched for articles citing Ofek and Srinivasan (2002) on Google Scholar: https://scholar.google.com/scholar?cites=2695900256536721328&as_sdt=5,33&sciodt=0,33&hl=en.

[67] Sukumar Declaration, ¶¶10, 19; McFarlane Declaration, ¶17.

the supply side of the market including Mercedes-Benz's competitors, competing products, cost structure for production of Class Vehicles and competing products, or any other aspect of car manufacturing and distribution. Merely assuming supply-side factors out of the analysis, as Dr. Sukumar did, is not only unrealistic but unscientific for the reasons previously explained.

## VI. DR. SUKUMAR'S CONJOINT DESIGN DOES NOT REFLECT REAL-WORLD CHOICES MADE BY CONSUMERS AND, THEREFORE, CANNOT ACCURATELY ESTIMATE REAL-WORLD MARKET PRICES

53. Dr. Sukumar's conjoint study examines how consumers change their product choice behavior in an Internet survey setting where they are offered a hypothetical generic Mercedes-Benz vehicle with and without certain optional features (including a seat heater with and without potential defects) and at different prices. The survey contains no information about the other characteristics of the vehicle or characteristics of competing vehicles that would likely influence consumer choice behavior, such as horsepower, miles per gallon, or vehicle size.[68]

54. In essence, Dr. Sukumar is attempting to extrapolate real-world market prices from a hypothetical setting where consumer choice behavior is based on artificially holding all other product characteristics and all competing products constant. This does not accurately reflect how consumers make choices in real marketplaces. Without fully accounting for other products and product characteristics that would influence consumer demand in real markets, or allowing for the possibility that the value of the seat heater (or any alleged defect associated with the seat heater) may vary depending on other characteristics of the vehicle, Dr.

---

[68] Such characteristics are included in other empirical studies of demand in the automobile market. *See,* e.g., Berry, S., J. Levinsohn, and A. Pakes (1995), "Automobile Prices in Market Equilibrium," *Econometrica*, 63(4), 841–890 ("Berry et al. (1995)"), at p. 868.

Sukumar at best provides an incomplete analysis of demand for a particular product feature, which cannot, by itself, yield an equilibrium market price.[69]

**A. Dr. Sukumar's Survey Presents an Artificial Scenario that Does Not Reflect Real-World Purchasing Decisions**

55. The reliability and validity of a survey instrument that is designed for the explicit purpose of analyzing equilibrium market prices ultimately depends on its ability to mimic real world conditions faced by the consumers. Dr. Sukumar's survey omits critical information that would inform real-world purchase decisions. In particular, Dr. Sukumar provides no information on promotions, reviews, or important vehicle features, such as engine horsepower, fuel efficiency, or overall safety rating. As a result, respondents in Dr. Sukumar's conjoint analysis are exposed to different information than they would have been exposed to if they were making the same choices in a real world setting—i.e., Dr. Sukumar's respondents have substantially more information about the five focal "additional features," but have substantially less or no information on all other aspects of the vehicle and competing products.[70] Dr. Sukumar provides no basis to conclude that consumers

---

[69] In their analysis of market equilibrium in the U.S. automobile industry, Berry et al. (1995) consider many different characteristics of vehicles: "the ratio of horsepower to weight (in *HP* per 10 lbs.), a dummy for whether air conditioning is standard (1 if standard, 0 otherwise), the number of ten mile increments one could drive for $1 worth of gasoline (*MP$*), tens of miles per gallon (*MPG*), and size (measured as length times width)." Berry et al. (1995), p. 870.

[70] For example, consumers can choose among different Mercedes-Benz 2017 GLE models listed on the MBUSA website. Before having the opportunity to consider other car features, consumers are first prompted with information on towing capacity, horsepower, torque, and engine type and size for each vehicle model listed. *See* Exhibit 4. This type of information is completely ignored by Dr. Sukumar's survey.

would make the same choices in a real world setting as they would in his survey setting given these large differences in information conditions.

56. Furthermore, Dr. Sukumar provides no information to survey respondents regarding the presence of an MBUSA warranty and/or Mercedes-Benz dealer goodwill repairs in case of defects in the additional features included in his survey, including the seat heater. Neither does Dr. Sukumar inform his survey respondents on possible factors that could affect the likelihood of defect manifestation (e.g., different patterns of vehicle use that might impact manifestation of the alleged defect).[71] As a consequence, Dr. Sukumar's omissions bias respondents' expressed valuations and render his survey results invalid as a prediction of real-world market behavior.

57. In addition, Dr. Sukumar instructs his respondents to choose among different packages of additional features for a Mercedes-Benz vehicle, and tells them that if they do not choose any of the presented packages then they are *not* buying a Mercedes-Benz vehicle.[72] In the real world, consumers are unlikely to be faced with these types of choices. That is, if a consumer does not like a given package of additional features, he/she can still buy a Mercedes-Benz vehicle and change or customize the package to suit his/her preferences or not buy a package at all.

---

[71] For example, according to Plaintiff's engineering expert, a seat heater malfunction is associated with "the driver repeatedly getting in and out of the vehicle." Plaintiff's Motion for Class Certification, p. 5. Assuming that this characterization is correct, consumers with light usage patterns (e.g., those who do not use their cars for commuting to work on a daily basis) might expect a lower risk of a seat heater malfunction relative to consumers who have heavy usage patterns (e.g., those who use their cars for daily commute to work, and/or use their cars for business travel on a regular basis).

[72] Sukumar Declaration, Exhibit 3, p. 23.

58. Finally, while respondents in Dr. Sukumar's survey make all of their choice decisions in a very short amount of time, a real car buyer would spend significant time weighing different options and would have high levels of involvement in the purchase decision. For example, a recent market study finds that 76% of car buyers research online prior to making a purchase.[73] According to this study, on average, car buyers spent 12 hours and 30 minutes researching online prior making a decision about their next car purchase. In striking contrast, 65.23% of Dr. Sukumar's respondents finished the survey in under 10 minutes.[74] Again, the hypothetical setting of Dr. Sukumar's survey creates a disconnect between the findings of his conjoint survey and the actual equilibrium market prices that would prevail.

### B. The Choice Between a Seat Heater with "1/100 Chance of Safety Risk" and a "Perfect" Seat Heater is Inconsistent with the Facts of the Case, Does Not Reflect Choices Consumers Face in the Real World, and Introduces Biases to Dr. Sukumar's Survey Results

59. Dr. Sukumar asks his respondents to make choices between a seat heater with a 1% probability of malfunction (i.e., "1/100 chance of safety risk" which is intended to approximate MBUSA's disclosure of the alleged defect) and a

---

[73] "2015 Automotive Buyer Influence Study: Sources that Influence Purchase," *AutoTrader.com* (http://agameautotrader.com/files/insights/pdf/2015AutomotiveBuyerInfluenceStudyBrochure.pdf).

[74] Of the 532 respondents who completed the survey, I found that 98 respondents (or 18.42%) took 5 minutes or less to finish the survey, 151 respondents (or 28.38%) took 6 minutes or less to finish the survey, 214 respondents (or 40.23%) took 7 minutes or less to finish the survey, 263 respondents (or 49.44%) took 8 minutes or less to finish the survey, 306 respondents (or 57.52%) took 9 minutes or less to finish the survey, and 347 respondents (or 65.23%) took 10 minutes or less to finish the survey. *See* the following data file produced by Dr. Sukumar: "Discount calculation with weight with Formula 14.xlsm."

seat heater with a de minimis or *zero* probability of malfunction (i.e., "seat heater without safety risk"). Neither the defect probability nor the comparison to a "perfect" seat heater reflects reality.

60. The 1% probability is based on Mr. McFarlane's analysis of the incidence of warranty and/or goodwill repairs of seat heaters for the affected vehicles.[75] However, incidence rates are not fixed and the realized incidence for at least some members of the class may have been much lower than 1%. Incidence rates calculated by Mr. McFarlane not only vary across different models and model years of Class Vehicles, but are also likely to vary over time for any given model of Class Vehicle. For example, the incidence rate calculated by Mr. McFarlane for the M-Class vehicles model year 2006 is 0.8%, lower than the assumed 1%.[76] This value represents the incidence rate from 2005 to 2015 for this particular vehicle, and it is likely that there was some period of time over the span of these 11 years when the incidence rate was lower than 0.8% (since this value is an aggregate measure).[77] Thus, the disclosure presented in Dr. Sukumar's survey (i.e., "1/100 chance of safety risk") would not have been accurate for many class members and, therefore, Dr. Sukumar's survey does not reflect the facts of the case.

61. Further, one would expect that respondents' answers and the results of Dr. Sukumar's survey will likely be heavily influenced by the stated probability of defect included in Dr. Sukumar's descriptions. Strikingly, Dr. Sukumar disagrees.

---

[75] McFarlane Declaration, ¶38; McFarlane Declaration, Figure 7. I understand that the actual failure rates are much lower than the estimated 1% because the denominator (i.e., number of vehicles sold with seat heaters) is much larger than what Mr. McFarlane used in his calculation.

[76] McFarlane Declaration, ¶38; McFarlane Declaration, Figure 7.

[77] I used the file "MBUSA_CALLAWAY_0097639 WARRANTY CONFIDENTIAL.xlsx" to examine the warranty claims on the Mercedes-Benz M-Class vehicles for model year 2006.

When questioned during his deposition about the impact of the stated probability of incidence rate on survey respondents' answers, Dr. Sukumar testified that the actual safety-risk percentage provided to consumers in his survey is not important, provided it is not extreme (e.g., 1 in 2 chance or 1 in 1 billion chance).[78] Specifically, Dr. Sukumar testified that the results of his survey (and the $609 "discount" he calculates) would not materially change if the incidence rate or the probability of manifestation of the seat heater "safety risk" he presents to the respondents was 1 in 5, 1 in 10, 1 in 100, or 1 in 1 million.[79] If this were true, then regardless of whether the risk of malfunction was increased by 20 times (from 1/100 or 1% to 1/5 or 20%) or the risk of malfunction was decreased by 10,000 times (from 1/100 or 1% to 1/1,000,000 or .0001%), consumers' responses would be the same. This is nonsensical and shows that Dr. Sukumar's analysis and findings are divorced from reality and unreliable.

62. Dr. Sukumar claims that the probability of seat heaters malfunctioning in Class Vehicles makes no difference to his survey respondents, because they were reacting to a "random chance" that the seat heater would malfunction.[80] This does not make any sense, and Dr. Sukumar has not tested how respondents comprehended and interpreted his descriptions of 1/100 probability of "safety risk" occurring. Without having done such an analysis, Dr. Sukumar has no basis for making this claim.

63. Moreover, from the perspective of reliably measuring the economic impact of a disclosure of an alleged defect in this case, Dr. Sukumar's claim that the

---

[78] Sukumar Deposition, pp. 303–304. For an extended discussion of Dr. Sukumar's explanation of the impact of incidence rates in his conjoint design, *see* Sukumar Deposition, pp. 117–123, 153–158, 282–283, 303–312.
[79] Sukumar Deposition, pp. 118–120.
[80] Sukumar Deposition, p. 121.

defect probability does not matter to consumers is highly problematic. First, this is essentially a concession that Dr. Sukumar's opinion is not driven by the real world and his methodology is highly flawed. If the results of the survey merely reflect consumer responses to some "random chance" of a seat heater malfunctioning (as Dr. Sukumar claims) that bears no relation to the actual rate of manifestation of the defect, then Dr. Sukumar cannot claim to have measured the real-world effect of a disclosure of the alleged defect at issue in this case.

64. Second, and more importantly, Dr. Sukumar's claim that the results of his model would not change in response to large changes to a key parameter in his design calls into question the validity and the reliability of his model. In fact, Dr. Sukumar's claim implies that his model would obtain roughly the same discount if it considered Mercedes-Benz vehicles that are not among the Class Vehicles and whose seat heaters do *not* have a "design defect."[81] On the other hand, if one were to accept as true Dr. Sukumar's claim that the Discount would not materially change in response to changes in the probability of the alleged defect, then Plaintiff's theory regarding the existence of a material "defect" in Class Vehicles relative to non-Class Vehicles is contradicted by Dr. Sukumar's own model estimates.

65. In addition, Dr. Sukumar's comparison of a seat heater with a 1% probability of malfunction to a seat heater with *zero* probability of malfunction (i.e., "seat heater without safety risk") is also conceptually and analytically problematic. Consumers understand that all products are prone to various types of defects and

[81] Plaintiff states that "the design defect exists in the SUV Class Vehicles as opposed to other models and years." Plaintiff's Motion for Class Certification, p. 7.

have some failure rate.[82] And, in fact, Mr. McFarlane's incident rate chart shows that there is some percentage of seat heaters malfunction even in the absence of the alleged defect.[83] Dr. Sukumar's defective seat heater is therefore probably a more realistic representation of an actual product than of a defect-free product, which does not exist. Given this setup, Dr. Sukumar's survey cannot capture the relative comparison that is appropriate in this case: a "normal" seat heater (which, like any component part in any vehicle, has some positive probability of malfunction) versus a seat heater with the probability of the alleged defect. Asking respondents to compare a seat heater with a "1/100 chance" of malfunctioning (regardless of whether the respondents would interpret this as "random chance" of malfunctioning) against a seat heater without *any* chance of malfunctioning (which does not exist in reality) biases Dr. Sukumar's analysis resulting in a higher discount.

### C. Prices Presented in Dr. Sukumar's Survey Do Not Reflect Real-World Prices

66. Dr. Sukumar's survey is also unrealistic because the pricing of the different additional feature packages included in the survey do not reflect real-world prices.[84] Specifically, Dr. Sukumar uses prices ranging from $250 to $2,500

---

[82] *See*, e.g., Deposition of Elizabeth Callaway on November 11, 2015 ("Callaway Deposition"), p. 176.

[83] McFarlane Declaration, ¶38; McFarlane Declaration, Figure 7.

[84] Dr. Sukumar includes 5 different car features in each of his choice scenarios in addition to price: front seat heaters, illuminated star, heated steering wheel, rear view camera, and bi-xenon headlights and cornering fog lamps. Each feature has three levels: with "safety risk," without "safety risk," and not present. Sukumar Declaration, Exhibit 2. Dr. Sukumar does not provide any basis for how he selected the attributes he included in his conjoint study. Furthermore, based on my review of the dealer guides, the "illuminated star" attribute considered by Dr. Sukumar is not offered as an option for any Class Vehicle.

for the package of five additional features in feature packages he asks his respondents to choose from. While Dr. Sukumar claims that this range is "based on the current price of these features charged by Mercedes Benz to their customers"[85] based on the information in Mercedes-Benz dealer guides, my analysis of Mercedes-Benz dealer guides showed that Dr. Sukumar's price ranges are not consistent with the information he said he relied on. For example, in his survey Dr. Sukumar included 212 questions containing one package in which bi-xenon headlights and cornering fog lamps with no "safety risk" was the only feature available (i.e., the other four additional features included in the packages (front seat heaters, illuminated star, heated steering wheel, and rear view camera) were "not present" in the package shown). The prices used by Dr. Sukumar for the packages that contained only the bi-xenon headlights and cornering fog lamps with no "safety risk" in these 212 questions varied from $500 to $2,000. This price range is in contrast to the $890 to $900 range for that feature found in the MBUSA dealer guides.[86]

---

[85] Sukumar Declaration, ¶23, footnote 11; Sukumar Declaration, Exhibit 3.

[86] The prices for bi-xenon headlights and cornering fog lamps for Class Vehicles (many of which are combined with a headlamp washer system) are contained in the following dealer guides: MBUSA_CALLAWAY_0095368–0095392 at MBUSA_CALLAWAY_0095386; MBUSA_CALLAWAY_0095310–0095320 at MBUSA_CALLAWAY_0095318; MBUSA_CALLAWAY_0095420–0095445 at MBUSA_CALLAWAY_0095430; MBUSA_CALLAWAY_0095446–0095456 at MBUSA_CALLAWAY_0095455; MBUSA_CALLAWAY_0096299–0096311 at MBUSA_CALLAWAY_0096309. I used the file "CBC.cho" provided by Dr. Sukumar to isolate the 212 questions described above.

## VII. THE IMPACT, IF ANY, OF A DISCLOSURE CANNOT BE DETERMINED THROUGH A COMMON METHOD BECAUSE A "MARKET PRICE" FOR ALL CLASS VEHICLES DOES NOT EXIST AND THE IDIOSYNCRATIC FACTORS AFFECTING TRANSACTION-SPECIFIC PRICES REQUIRE INDIVIDUALIZED INQUIRY

67. Even if the methodology used by Plaintiff's experts could deliver an estimate of market prices as matter of economic theory in the abstract (it cannot), Plaintiff's theory of class-wide injury in this case—that the disclosure of the alleged defect would have reduced the "market price" of Class Vehicles at all times over the course of the 16-year class period, regardless of the characteristics of the vehicles or of the specific purchase transactions—is empirically invalid and contrary to established economic studies of the U.S. automobile market.

68. The class is comprised of different vehicle models and model years (M-Class model years 2000 to 2007, R-Class model years 2006 and 2007, and GL-Class model year 2007), as well as new and used vehicles sold to different consumers at different times, under varying market conditions. Since the factors that affect market price vary across transactions, there is no reason to believe that the impact of the disclosure would affect the prices of Class Vehicles in the same way across different vehicles and over time. That is, Plaintiff's experts' assumption that the $609 market price discount would have applied equally to all relevant purchase transactions across a period of 16 years is inconsistent with the realities of the automobile market. Without an individualized inquiry into the idiosyncratic factors that determine the transaction price of each Class Vehicle, it is not possible to determine whether the disclosure would have any effect on the final transaction price of a particular Class Vehicle. Therefore, it is not possible to determine whether any purchaser would be injured at all using a common method.

### A. There Is No Scientific Validity for the Assumption that Dr. Sukumar's $609 Discount Would Have Applied Equally to All Relevant Purchase Transactions Since the Factors that Affect Market Prices Vary Across Transactions

69. It has been well established in the academic literature and industry publications that automobiles differ from a homogenous product in many important respects, causing the prices to show enormous variation across vehicles, vehicle models, transactions, and over time. In fact, the structure of the automobile market has been used as the motivation for developing theories and analytical techniques for investigating competition in differentiated product markets.[87]

70. In contrast with many markets where consumers pay posted prices (for example, products sold in a supermarket), the car market has additional complexity in determining a market price since the same product may sell for significantly different prices as a result of individual negotiations between the buyer and the seller, who differ in their search and negotiation ability, as well as other transaction-specific factors that can vary across products and over time.[88] Consequently, there

---

[87] *See*, for example, Berry, S., J. Levinsohn, and A. Pakes (1995), "Automobile Prices in Market Equilibrium," *Econometrica*, 63(4), 841–890, which uses annual automobile sales for 20 years, examines the demand for automobiles, and controls for observed characteristics such as horsepower, size, and air conditioning. The authors provide methods to empirically model supply and demand for differentiated products.

[88] For instance, Goldberg states that dealer discounts for new cars are influenced by purchase transaction variables, such as "first-time purchase, trade-in, and financing through dealer." *See* Goldberg, P. K. (1996), "Dealer Price Discrimination in New Car Purchases: Evidence from the Consumer Expenditure Survey," *Journal of Political Economy*, 104(3), 622–654 ("Goldberg (1996)"). Further, Zettelmeyer, Morton, and Silva-Risso find that car purchasers may use online information to obtain lower prices. *See* Zettelmeyer, F., F. S. Morton, and J. Silva-Risso (2006), "How the Internet Lowers Prices: Evidence from Matched Survey and Automobile Transaction Data," *Journal of Marketing Research*, 43(2), 168–181. Additionally,

is wide dispersion in transaction prices for a particular model and year of vehicle, even at a single point in time.[89] For instance, Goldberg (1996) examines price differences in new car purchases by analyzing data from Bureau of Labor Statistics' Consumer Expenditure Survey and finds significant price variation.[90] Goldberg (1996) identifies price dispersion in new car purchases and explains that "differences in the empirical transactions price distributions could arise from three sources: supply behavior, buyers' bargaining behavior, or differences in reservation prices."[91] Similarly, analyzing data on 1,500 vehicle purchases in California, Zettelmeyer et al. (2006) finds that the Internet helps car buyers in new vehicle price negotiations and lowers car prices in two ways: (i) by informing consumers about dealers' invoice prices, and (ii) by helping consumers obtain lower prices due to the online buying service referral process.[92]

71. This complexity is compounded by the nature of automobiles themselves, which come in a variety of configurations due to different feature

---

Morton, Silva-Risso, and Zettelmeyer find that "a [car] buyer's search cost and bargaining disutility have significant effects on bargaining outcomes." *See* Morton, F. S., J. Silva-Risso, and F. Zettelmeyer (2011), "What Matters in a Price Negotiation: Evidence from the US Auto Retailing Industry," *Quantitative Marketing and Economics*, 9(4), 365–402.

[89] *See*, e.g., "Used Mercedes-Benz GL-Class for Sale," TrueCar (https://www.truecar.com/used-cars-for-sale/listings/mercedes-benz/gl-class/year-2007/) for variation in prices for used 2007 Mercedes-Benz GL-Class Vehicles. Data for new GL-Class vehicles shows similar variation, "2016 Mercedes-Benz Price Report," TrueCar (https://www.truecar.com/prices-new/mercedes-benz/gl-pricing/).

[90] Goldberg (1996), p. 626.

[91] Goldberg (1996), p. 652.

[92] Morton, F. S., F. Zettelmeyer, and J. Silva-Risso (2003), "Consumer Information and Discrimination: Does the Internet Affect the Pricing of New Cars to Women and Minorities?," *Quantitative Marketing and Economics*, 1(1), 65–92.

options and therefore vary in price and product characteristics within a product line. For instance, the 2006 R350, such as the one owned by the named Plaintiff, had 10 individually selectable optional features ranging in price from $385 to $1,050, as well as 11 available optional feature packages (with some overlap with individual feature options) ranging in price from $890 to $5,400.[93] This vehicle also has 6 seat covering choices, 2 trim choices, and 10 colors (some of which incur an extra charge).[94] Without even considering optional feature packages, this yields numerous possible configurations of seat cover, trim and color options for this single model in a single year. It should also be noted that the R350 is one of two Mercedes R-Class vehicles (the other being the R500),[95] that the R-Class is one of only 12 vehicle classes offered by MBUSA for sale in 2006,[96] and that MBUSA is only one of several firms that participates in the luxury car segment of the broader car market (the broader market includes even more models and manufacturers).

72. One of the reasons why a firm might offer so many feature combinations is that consumers may have different preferences over features and different valuations for these features. It is the combination of variation in product features and variation in consumer tastes that makes the car market a differentiated product market. Differentiated product markets do not have a single "market price"

---

[93] MBUSA_CALLAWAY_0095292–0095309 at MBUSA_CALLAWAY_0095303–304. An example of optional feature package is the Sunroof Package, which includes an electric sunroof, rear pop-out windows, and double sun visors. *See* MBUSA_CALLAWAY_0095292–0095309 at MBUSA_CALLAWAY_0095304.

[94] MBUSA_CALLAWAY_0095292–0095309 at MBUSA_CALLAWAY_0095305.

[95] MBUSA_CALLAWAY_0095292–0095309.

[96] "Used 2006 Mercedes-Benz Values," NADA Guides, last visited on July 11, 2016 (http://www.nadaguides.com/Cars/2006/Mercedes-Benz).

but a variety of market prices at a minimum for each product configuration[97] and possibly for each transaction.

73. Similar variation in prices appears in the resale market due not only to variations in product configurations, but also to additional factors such as customer usage, mileage, accident and maintenance history that affect the vehicle's condition. For instance, the NADA Price Guide shows that the average trade-in price in 2016 for a 2006 Mercedes R350 can vary from $4,025 to $6,550 (a difference of $2,525) due to condition alone (not considering additional factors such as options, mileage and location which add further variation).[98] Other supply-side factors can also affect prices, such as timing of changes to new vehicles (e.g., model or feature upgrades, introduction of new models), and the dynamics of new vehicle lease programs that cause the used vehicle supply to fluctuate.[99] Furthermore, idiosyncratic and aggregate fluctuations in business conditions (such as costs, local competition, etc.) for the intermediaries in the supply chain, such as Mercedes-Benz dealers, affect their willingness to sell and therefore introduce further variation in

---

[97] For example, MBUSA currently offers three different base GLS models, ranging from $68,700 for the GLS450 to $124,100 for the GLS63. With extra features (e.g., performance steering wheel, sound systems), the price of the GLS63 can rise to over $140,000. "2016 Mercedes-Benz GLS Vehicles," MBUSA (https://www.mbusa.com/mercedes/vehicles/class/class-GLS/bodystyle-SUV).

[98] "2006 Mercedes-Benz R Class-V6/V8-4WD," NADA Guides (http://www.nadaguides.com/Cars/2006/Mercedes-Benz/R-CLASS-V6-V8-4WD/Utility-4D-R350-4WD/Values). This website requires a specific zip code before the page fully loads. I used the zip code 90058 which corresponds to the city of Los Angeles for the purposes of this example.

[99] *See*, e.g., "Surge In End-Of-Lease Cars Seen Pressuring Prices In Record Sales Year," *Automotive News*, February 1, 2016 (http://www.autonews.com/article/20160201/RETAIL01/160209997/surge-in-end-of-lease-cars-seen-pressuring-prices-in-record-sales-year).

vehicle transaction prices. Finally, Plaintiff's experts have also acknowledged the presence of price dispersion in vehicle prices.[100]

**B. Plaintiff Cannot Determine the Impact, If Any, of a Hypothetical Disclosure of the Alleged Defect without Individualized Inquiry**

74. As a result of all of this variation, it is clear that a singular "market price" for Class Vehicles cannot and does not exist. In this market setting, each transaction has an individual market price and the reasons for wide variations in market prices for seemingly identical vehicles cannot be determined without an individualized inquiry. Consequently, there is no common method that can be used to determine the effect of the disclosure on a "market price," because there is no one "market price" for Class Vehicles. Similarly, there is no reason to believe that the factors that cause the price of vehicles to vary would not also cause the impact of the disclosure to vary. Dr. Sukumar's conclusion that "market price" would have been reduced by $609 for every Class Vehicle, in every individual transaction, across different models with different configurations, over the course of 16 years, is plainly incorrect. It ignores the realities of the automobile market in which, as described above, transaction-specific factors influence prices significantly. To determine the effect, if any, of a hypothetical disclosure of an alleged defect on the sales price of a particular vehicle would require individualized inquiry on a consumer and transaction basis.

[100] McFarlane Deposition, p. 78; Sukumar Deposition, pp. 83–84.

## VIII. DR. SUKUMAR'S RESULTS INDICATE THAT MANY CLASS MEMBERS WERE NOT HARMED BY LACK OF DISCLOSURE OF THE ALLEGED DEFECT AND THERE IS SUBSTANTIAL VARIATION IN DISCOUNTS THAT DR. SUKUMAR'S RESPONDENTS WOULD DEMAND INDIVIDUALLY

75. The fact that disclosure of the alleged seat-heater "safety risk" could not have a common impact on the market prices of Class Vehicles is verified by Dr. Sukumar's own survey results. That is, even assuming that Dr. Sukumar's analysis can generate reliable results that can be extrapolated to putative class members, his results indicate that the value of the alleged defect varies substantially across the class and that many class members were not harmed because they would not have paid less for their Class Vehicles even had they received the "safety risk" disclosure.

### A. Removal of Dr. Sukumar's Arbitrary Attribute Constraints Shows that Many Consumers Would Not Be Harmed if MBUSA Disclosed the Alleged Defect

76. Dr. Toubia discusses in detail in his declaration that Dr. Sukumar imposes a number of attribute and price constraints when he analyzes his conjoint data.[101] In particular, Dr. Sukumar imposes the constraint that respondents would prefer a "perfect" seat heater—one that does not have a "safety risk"—to a seat heater that has a "safety risk" (or a "defective" seat heater). He also imposes the constraint that respondents prefer a "defective" seat heater to not having the seat heater option at all in the feature packages they are considering. It is important to examine the extent to which Dr. Sukumar's calculated Discount is driven by the imposition of these constraints as opposed to the underlying data.[102] In my own

[101] For a detailed discussion of the constraints imposed by Dr. Sukumar, *see* Toubia Declaration, ¶¶60–67.

[102] By imposing constraints, Dr. Sukumar ignores his respondents' expressed preferences. As a result, Dr. Sukumar's results reflect his own views of what

experience evaluating empirical work as an academic journal editor, a key consideration about the validity of any statistical analysis is how sensitive the model is to assumptions imposed by the researchers. Therefore, I compared Dr. Sukumar's results with and without the attribute constraints he imposed.

77. Specifically, I re-estimated Dr. Sukumar's model after removing his attribute constraints and calculated the Discount that each respondent would demand for a "defective" seat heater as opposed to a "perfect" seat heater ("Individual-Level Discount"). Exhibit 5 reports the summary statistics for these Discounts, and shows that almost 40% of respondents required a *negative* discount, hence these respondents would not be willing to pay more for a "perfect" seat heater relative to a "defective" seat heater.[103] Moreover, as the scatterplot in Exhibit 6 illustrates, there is substantial heterogeneity in individuals' demanded discounts for a "defective" seat heater.[104] In sum, Dr. Sukumar's own survey shows that the potential effect of the disclosure varies considerably across the putative class and that there are many consumers for whom the disclosure would have little or no effect—they would have been willing to purchase the vehicle at the same price even had the disclosure been made. Therefore, far from showing a "common" impact of the hypothetical disclosure on consumers' willingness to pay for a vehicle, Dr. Sukumar's results show *exactly the opposite* that *many consumers*

---

survey respondents "should" prefer, rather than reflecting the actual answers given. Sukumar Deposition, pp. 191–200.

[103] As discussed in the Toubia Declaration, when Dr. Sukumar's attribute constraints were removed, approximately 38% of the respondents preferred a "defective" seat heater to a "perfect" seat heater. Toubia Declaration, ¶¶63, 65.

[104] For ease of presentation, Exhibit 6 shows a scatterplot of the Individual-Level Discounts for respondents who would demand a Discount greater than -$2,500 and less than $2,500.

*would not be harmed* and would have made exactly the same product choice and would not have paid less if the alleged defect were disclosed.

**B. Most Survey Participants Do Not Show a Statistically Significant Difference in Their Preferences Between a "Perfect" and a "Defective" Seat Heater**

78. One of the inputs to Formula 14 is the estimated valuation (or "part-worth utility") for the feature at issue for each respondent. In order to calculate the Discount per Formula 14, Dr. Sukumar first calculates an estimated mean part-worth utility for a potentially "defective" seat heater and an estimated mean part-worth utility for a "perfect" seat heater for each respondent.[105] For each respondent, the mean part-worth utility represents the mean of a distribution of part-worth utility values estimated through Dr. Sukumar's conjoint analysis. In fact, because of variation due to sampling, model error or other factors that arise in statistical analysis, it is not possible to generate an exact estimate for the part-worth utility for an attribute for a particular respondent. For instance, Dr. Sukumar estimates that the individual with Respondent ID 51846 has a mean part-worth utility for a "perfect" seat heater of 0.35 with a standard deviation of 0.50, and a mean part-worth utility for a "defective" seat heater of -0.13 with a standard deviation of 0.28.[106] Dr. Sukumar does not use or discuss these estimated standard deviations in his report.

---

[105] More specifically, Dr. Sukumar uses the difference between estimated mean part-worth utility for a potentially "defective" seat heater and an estimated mean part-worth utility for a "perfect" seat heater for each respondent as inputs to Formula 14 to arrive at his $609 Discount. *See* the following data file produced by Dr. Sukumar: "Discount calculation with weight with Formula 14.xlsm."

[106] *See* the following data files produced by Dr. Sukumar: "Seatheater filter, unweighted_stddev.csv" and "Seatheater filter, unweighted_utilities.csv."

79. Once the variation in part-worth utility estimates is properly taken into account, Dr. Sukumar's estimates indicate that there is no statistical difference between the part-worth utilities of a "defective" and a "perfect" seat heater for more than 79% of the respondents in the sample. A conventional way to account for variance is to compute a 95% confidence interval, which is the estimated range that a parameter value might take with 95% probability.[107] For instance, the 95% confidence interval for Respondent 51846 is 0 to 1.81 for the part-worth utility of a "perfect" seat heater, and -0.9 to 0.27 for the part-worth utility of a "defective" seat heater. Note that there is significant overlap between the confidence intervals for the part-worths of a "perfect" and a "defective" seat heater, which implies that the part-worths for a "perfect" and a "defective" seat heater cannot be statistically distinguished from each other for this respondent. This happens for more than 79% of the respondents in Dr. Sukumar's sample. That is, when examined on an individual basis using Dr. Sukumar's own survey results, the vast majority of consumers show no statistically significant difference in the value they would get from a "perfect" versus a "defective" seat heater. Properly accounting for the variances in Dr. Sukumar's estimates therefore implies that Dr. Sukumar cannot conclude that the majority of consumers would have required a discount.

### C. There is Substantial Variation in Discounts that Dr. Sukumar's Respondents Would Demand Individually, if MBUSA Disclosed the Alleged Defect

80. A close examination of Dr. Sukumar's results shows respondents' reactions to the disclosure of the alleged defect varies significantly. I calculated the

---

[107] Using the results from Dr. Sukumar's survey ("CBC.cho"), I re-ran Dr. Sukumar's model estimation through the Sawtooth Software while saving, for each respondent, 20,000 draws from the posterior distribution of each part-worth utility parameter. Based on these draws, I then obtained the 95% confidence interval by computing the 2.5th and 97.5th percentiles for each part-worth utility's distribution.

Individual-Level Discount or the Discount that each respondent would demand for a "defective" seat heater as opposed to a "perfect" seat heater based on the results obtained by Dr. Sukumar from the estimation of his model with all of his constraints.[108] Exhibit 7 reports the summary statistics for these Individual-Level Discounts, and shows that the Individual-Level Discounts for many respondents was negligible. For example, the Individual-Level Discount was as low as 10¢ for the respondent who had the lowest Individual-Level Discount, and for 30% of the respondents, Individual-Level Discounts were less than $75. Exhibit 7 also shows significant variation in respondents' Individual-Level Discounts. For example, the Individual-Level Discount for some respondents exceeds the price of the vehicle itself and is equal to $160,126 for the respondent who had the largest Individual-Level Discount. The large variation in the value of Individual-Level Discounts is also evident in the large standard deviation (a statistical measure of variation) observed ($10,767) in Dr. Sukumar's results. Thus, far from demonstrating that the disclosure of a seat heater defect would have had a common, class-wide impact on market prices, Dr. Sukumar's survey shows that consumers' reaction to the disclosure would be highly disparate and individualized. Dr. Sukumar himself recognizes that different respondents assign different values to a seat heater with the alleged "safety risk," and admits that, in case of disclosure, some individuals would not buy a car with a seat heater with an alleged "safety risk" at any price, while others would buy it without asking for *any* discount.[109] For a more visual

---

[108] Dr. Sukumar's Discount is an *aggregate* measure of Individual-Level Discounts and is generated by taking a weighted average of the components of Individual-Level Discounts. *See* Section VIII.D for a more detailed discussion. I used the data in "Discount calculation with weight with Formula 14.xlsm" produced by Dr. Sukumar.

[109] Sukumar Deposition, pp. 50–51, 246–247.

illustration of the variation in the Individual-Level Discounts for Dr. Sukumar's respondents I provide a scatterplot in Exhibit 8.[110]

### D. Dr. Sukumar's Discount Calculation is Heavily Influenced by Extreme Values

81. The heterogeneity in Individual-Level Discounts is obscured by Dr. Sukumar's Discount calculation, which generates a *weighted average* of Individual-Level Discount measures through the application of Formula 14.[111] That is, Dr. Sukumar lumps the different preferences of all respondents together and comes up with a single number, $609, which does not correspond to any market value.

82. Since Dr. Sukumar's calculation is a weighted average of Individual-Level Discounts, it is heavily influenced by extreme responses given by survey participants. As shown in Exhibit 9, after excluding respondents with an Individual-Level Discount (for receiving a "defective" versus a "perfect" seat heater) greater than $5,878.65 (i.e., the top 10% of Individual-Level Discounts in the sample), the value of Dr. Sukumar's Discount decreases by about 30%, dropping from $609 to $429. Furthermore, after excluding respondents with an Individual-Level Discount greater than $1,725.22 (i.e., the top 25% of Individual-

[110] For ease of presentation, Exhibit 8 shows a scatterplot of the Individual-Level Discounts for respondents who would demand a discount less than $2,500.

[111] In applying Formula 14, Dr. Sukumar takes the ratio of two weighted averages. The numerator is a weighted average of each respondent's estimated valuation for a "perfect" seat heater minus the respondent's valuation for a "defective" seat heater. The weighting is done by applying the respondent's likelihood of purchase of a Mercedes-Benz vehicle and the demographic weight Dr. Sukumar assigns to each respondent. The denominator is a weighted average of each respondent's estimated valuation for price, calculated as the difference between the respondent's valuation of paying $250 and the respondent's valuation of paying $2,500, divided by $2,250 (the difference between $2,500 and $250). The weights applied to each respondent in the denominator are the same as those used in the numerator for that respondent.

Level Discounts in the sample) Dr. Sukumar's Discount decreases to $295.69, which is less than half of the $609 Dr. Sukumar calculates.[112] As a result, Dr. Sukumar's discount calculation crucially hinges on the presence of a small fraction of respondents with unrealistically high Individual-Level Discounts and his methodology generates unreliable results.

**E. Dr. Sukumar's Discount Calculation is Heavily Influenced by Arbitrary Assumptions on How Survey Responses Convert to Dollar Values**

83. Dr. Sukumar uses two specific price points—namely, $250 and $2,500—in his calculation of respondents' valuations for the price attribute. These valuations are important inputs to Formula 14—they allow the derivation of a dollar equivalent to respondents' valuations of a "perfect" versus a "defective" seat heater—and can theoretically be derived by using any combination of two prices among the seven included in Dr. Sukumar's survey.[113] Dr. Sukumar's estimated discount is highly sensitive to the price points used, and different price points deliver wildly different discounts. For example, by using $1,500 and $2,000, one obtains a discount of $380.69, as opposed to the $609.09 Discount Dr. Sukumar obtains using $250 and $2,500.[114] The fact that simple changes in calculations of

---

[112] *See* Exhibit 9.

[113] The prices included in Dr. Sukumar's survey are $250, $500, $750, $1,000, $1,500, $2,000, and $2,500. For each respondent, Dr. Sukumar estimates a level of utility for each of these price points. Each respondent's value of paying one dollar is the ratio between the difference in the estimated utility for any two of the seven prices listed above (for example, $1,000 and $2,000) and the difference between these two price points. In total, there are 21 possible combinations of prices that can be used to estimate the value of one dollar.

[114] To calculate the Discount using the price points of $1,500 and $2,000, I used the file "Discount calculation with weight with Formula 14.xlsm" provided by Dr. Sukumar.

the data produce highly disparate values of the Discount is an indication of fundamental problems in Dr. Sukumar's methodology.

## IX. DR. SUKUMAR MAKES NO ATTEMPT TO VALIDATE HIS RESULTS AND EVIDENCE SUGGESTS THAT DR. SUKUMAR'S ESTIMATES ARE INCONSISTENT WITH REAL-WORLD DATA

84. It is a common practice in applied research to substantiate the results and implications of an analysis such as the one Dr. Sukumar undertook against real-world data, something Dr. Sukumar refrains from doing in his declaration. Determining external validity—that is, whether the results of a study correspond to real-world observation—is an important step in proper research design. Specifically, one of Dr. Sukumar's findings is the "price premium" of $1,275.87 for "a vehicle with a front seat heater which has no safety risk as compared to buying a vehicle without a front seat heater."[115] In his declaration, Dr. Sukumar makes no attempt to check how this "price premium" compares to seat heater prices for Class Vehicles. Such a comparison actually shows a large discrepancy between Dr. Sukumar's "price premium" ($1,275.87) and available standalone prices of seat heaters for Class Vehicles quoted in Mercedes-Benz dealer guides (which range from $650 to $700).[116]

---

[115] Sukumar Declaration, ¶53.

[116] To the extent the prices quoted in Mercedes-Benz dealer guides reflect manufacturer's suggested retail price ("MSRP"), dealer guide prices can be considered conservative approximations of actual market prices (i.e., it is extremely unlikely that a consumer would be willing to pay over "sticker price" in a normally functioning market, suggesting that actual prices paid are equal to or less than the dealer guide prices). This suggests that Dr. Sukumar's "price premium" estimate is at least twice as much as real world prices for Class Vehicles' seat heaters. *See, e.g.*, MBUSA_CALLAWAY_0095407–0095419 at MBUSA_CALLAWAY_0095409; MBUSA_CALLAWAY_0095446–0095456 at MBUSA_CALLAWAY_0095455.

85. Given the complexity of the automobile market (e.g., individual negotiations and transaction specific price factors) and variations across products (e.g., the seat heater is sold bundled in different ways on different vehicles) it is unclear how these two figures should exactly correspond. However, the large discrepancy does raise questions about the external validity of Dr. Sukumar's estimates. Dr. Sukumar apparently did rely on these prices in designing his survey, but was unwilling or unable to answer whether these figures represent actual market prices.[117] If these are not market prices, then Dr. Sukumar is unable to confirm that his survey was designed using realistic market characteristics and to confirm the external validity of his analysis. If these are representative market prices, then his results have an unexplained discrepancy with market prices.

86. When questioned about validation of his results during his deposition, Dr. Sukumar testified that the $609 discount he calculated is validated by the fact that the amount is less than seat heater repair costs.[118] Comparison of Dr. Sukumar's purported market price discount for a "defective" seat heater to the cost of repairing a defective seat heater makes no economic sense. First, Dr. Sukumar performed no analysis to determine the actual cost of seat heater repair, but he took for granted from Plaintiff's counsel that the repair cost was "about a thousand dollars."[119] Second, there is no logical relationship between what Dr. Sukumar's

---

[117] Note that Dr. Sukumar made contradictory statements about the value of using MSRP from dealer guides as a proxy for market price. At first, he said MSRPs were relevant to designing the survey, because they reflect "real-world" prices. However, when he was confronted with the fact that his "price premium" of $1,275 for riskless seat heater is higher than the MSRPs observed in the market, Dr. Sukumar stated that MSRPs are not reflective of market prices. Sukumar Deposition, pp. 84–85, 189–191, 221–222, 313–318.

[118] Sukumar Deposition, pp. 315–316.

[119] Sukumar Deposition, p. 316.

model purports to estimate—the difference between "buying a vehicle with a front seat heater with a safety risk as compared to one without a safety risk" had MBUSA disclosed the alleged seat heater defect—and the cost of repairing a defective seat heater.[120] Change in equilibrium market prices for specific vehicles with a "defective" versus a "perfect" seat heater and cost of repair for "defective" seat heaters are two distinct concepts that are influenced by different economic factors. As discussed earlier, changes in equilibrium market prices for vehicles are affected by changes in both demand and supply factors, while the cost of repair for seat heaters is affected by factors such as cost of raw materials and cost of labor.

87. In sum, there is no defined relationship between changes in equilibrium market prices of vehicles and cost of repair of "defective" seat heaters, and Dr. Sukumar provided no argument or analysis to show how they are related.

## X. PLAINTIFF OFFERS NO METHODOLOGY FOR DETERMINING APPORTIONMENT OF ANY MARKET PRICE CHANGE ACROSS MULTIPLE RESALE TRANSACTIONS

88. Class Vehicles range in age from 9 to 16 years and, as such, it is likely that, over the course of the class period, many of these vehicles have been resold one or more times.[121] Even if a disclosure of the alleged defect would have lowered the sales price of a new vehicle by the amount of Dr. Sukumar's discount, it is unclear how the utility (and the resulting purchase decisions) of new vehicle

---

[120] Sukumar Declaration, ¶51.

[121] For example, based on the estimates provided by IHS Automotive—the leading source of data on the automotive industry—, as of the first quarter of 2006 the average new car was owned for about 52 months (4.3 years) and the average used car was owned for about 38 months (3.2 years). *See* "Average Age of Light Vehicles in the U.S. Rises Slightly in 2015 to 11.5 years, IHS Reports," *IHS Markit Newsroom*, July 29, 2015 (http://press.ihs.com/press-release/automotive/average-age-light-vehicles-us-rises-slightly-2015-115-years-ihs-reports).

purchasers and purchasers in subsequent resale markets would change as a result of the disclosure.

89. For instance, under Plaintiff's theory, if the alleged defect was disclosed then consumers may have paid less for a Class Vehicle initially, but they would also have experienced a lower trade or resale price which would have offset any gain they experienced from a lower initial purchase price. This is especially likely under Plaintiff's theory, since Plaintiff's experts argue that the discount should be exactly the same in the new and resale markets.[122, 123] For instance, consistent with Plaintiff's theory, a consumer who purchased a new Class Vehicle might have "overpaid" by $609, but would have also received $609 more upon resale or trade-in of the same Class Vehicle. Other than time value of money considerations, this consumer would have no change in utility, nor would any other

---

[122] For example, "Q: … And I want you to assume that Mr. Callaway, a year after having the vehicle, said 'I think this car's ugly, I want to trade it in,' and he does, and then the dealer turns around and certifies it again and sells it a third time as a certified pre-owned. A: Um-hmm. Q: In each of those instances, there would be a $609 discount, correct? A: That's correct. Q: For one car? A: That's correct. Q: Across four years? A: That's -- well, based on the hypothetical that you described, that's in fact correct, yes." McFarlane Deposition, p. 104. Furthermore, Mr. McFarlane did not provide any economic analysis or economic motivation to justify the opinion that the discount should be exactly the same in the new and resale markets. Rather, he testified that such opinion was based on what Plaintiff's counsel told him was a legal rule regarding damages. McFarlane Deposition, pp. 111–113.

[123] Dr. Sukumar claims that his discount is the same for participants in his survey that were pre-owned customers versus new customers (Sukumar Declaration, ¶ 52). This is in part due to the imprecision of his estimates which cannot distinguish moderate levels of difference. The CPO customers' discount was 11% less on average ($567.74 versus $637.77) than new purchasers' discount. However, the relevance of this figure is unclear since the survey only asks consumers their preferences for a new Mercedes-Benz vehicle.

subsequent consumers who purchased and then re-sold or traded-in the vehicle. This suggests that either (i) the class should be restricted to final owners rather than any purchaser, or (ii) the injury to class members is not properly represented by the discount calculated by Dr. Sukumar (even assuming all other aspects of Plaintiff's theory are true).

90. This scenario highlights another problem with Plaintiff's theory, namely that Plaintiff is trying to recover multiple losses for the same vehicle. As noted above, this cannot be correct and further highlights the problems of attempting to argue for a common market impact of widely varying products, sold under a variety of different conditions, over a 16-year time period.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on August 9, 2016.

Lorin M. Hitt