1   FRANK SIMS & STOLPER LLP
    Jason M. Frank (Bar No. 190957)
2   jfrank@lawfss.com
    Scott H. Sims (Bar No. 234148)
3   ssims@lawfss.com
    19800 MacArthur Blvd., Suite 855
4   Irvine, CA 92612
    Telephone:   949-201-2400
5   Facsimile:    949-201-2405

6   YUHL CARR LLP
    Eric F. Yuhl (Bar No. 102051)
7   eyuhl@yuhlcarr.com
    Colin A. Yuhl (Bar No. 259196)
8   cayuhl@yuhlcarr.com
    4676 Admiralty Way, Suite 550
9   Marina del Rey, CA 90292
    Telephone:   310-827-2800
10  Facsimile:    310-827-4200

11  McNICHOLAS & McNICHOLAS, LLP
    John Patrick McNicholas, IV (Bar No. 125868)
12  pmc@mcnicholaslaw.com
    10866 Wilshire Blvd., Suite 1400
13  Los Angeles, CA 90024
    Telephone:   310-474-1582
14  Facsimile:    310-475-7871

15  Attorneys for Plaintiff

16
17                  **UNITED STATES DISTRICT COURT**

                    **CENTRAL DISTRICT OF CALIFORNIA**
18
19

20  WILLIAM S. CALLAWAY, on behalf          CASE NO.:
    of himself and all others similarly     2:16−cv−01346−DMG−AJW
21  situated,

22                          Plaintiffs,     **MEMORANDUM OF POINTS
                                            AND AUTHORITIES IN SUPPORT
23  vs.                                     OF PLAINTIFF'S MOTION FOR
                                            AWARD OF ATTORNEYS' FEES,
24  MERCEDES-BENZ USA, LLC, a               COSTS AND INCENTIVE AWARD**
    Delaware limited liability company; and
25  MISSION IMPORTS d/b/a Mercedes
    Benz of Laguna Niguel, a California     Date:        March 5, 2018
26  corporation,                           Time:        1:30 p.m.
                                            Courtroom:   10C
27                          Defendants.

28

---

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEYS' FEES, COSTS AND INCENTIVE AWARD**

# **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................. 1

II.     CASE BACKGROUND AND HISTORY ........................................................... 2

III.    SUMMARY OF THE SETTLEMENT AND ESTIMATED VALUE .............. 7

      A.     The Settlement Class ............................................................................... 7

      B.     The Settlement's Primary Terms ............................................................. 7

            1.     Free Repair for Current Owners. ................................................. 7

            2.     Extended Warranty on Seat Heaters. ........................................... 8

            3.     Reimbursement for Past Repairs. ................................................. 9

            4.     Attorneys' Fees, Incentive Awards and Administration Costs. ................. 9

            5.     Release. ....................................................................................... 10

IV.     THIS MOTION SHOULD BE GRANTED ...................................................... 10

      A.     Class Counsel's Fee Request Is Fair, Reasonable and Appropriate. ..................... 10

            1.     Class Counsel's Fee Request Is Fair and Reasonable Under the Percentage
               of the Benefit Method. ............................................................... 11

             2.     The Fee Request Justified Under the Lodestar Method. ........................... 16

      B.     Class Counsel's Request for Reimbursement of Expenses Is Reasonable and
          Appropriate ............................................................................................ 19

      C.     Plaintiff's Incentive Award Request Is Fair, Reasonable, and Appropriate. .......... 20

V.      CONCLUSION ................................................................................................. 21

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Federal Cases**

4

Aichele v. City of Los Angeles,

5

    2015 WL 5286028 (C.D. Cal. Sept. 9, 2016) ......................................... 17

6

In re Bluetooth Headset Prods. Liabl. Litig.,

7

    654 F.3d 935 (9th Cir. 2011) ...................................................... 11

8

Boeing v. Van Gemert,

9

    444 U.S. 427 (1980)................................................................. 11

10

Lopez v. Youngblood,

11

    2011 WL 10483569 (E.D. Cal. Sept. 1, 2011) ............................... 11

12

Nwabueze v. AT & T Inc.,

13

    2013 WL 6199596 (N.D. Cal. Nov. 27, 2013) ............................... 11

14

Ogbuehi v. Comcast of California/Colorado/Florida/Oregon, Inc.,

    2015 WL 3622999 (E.D. Cal. June 9, 2015) .................................. 21

15

Rodriguez v. W. Publ'g Corp.,

16

    563 F.3d 948 (9th Cir. 2009) ...................................................... 20

17

Staton v. Boeing Co.,

18

    327 F.3d 938 (9th Cir. 2003) ...................................................... 10

19

Van Vranken v. Atl. Richfield Co.,

20

    901 F. Supp. 294 (N.D. Cal. 1995)............................................... 20

21

Vizcaino v. Microsoft Corp.,

22

    290 F.3d 1043 (9th Cir. 2002) .................................................... 12

23

Williams v. MGM-Pathe Commc'ns Co.,

    129 F.3d 1026 (9th Cir 1997) ..................................................... 12

24

25

26

27

28

## I.   INTRODUCTION

On September 18, 2017, this Court granted preliminary approval of a proposed nationwide class action settlement between Plaintiff William Scott Callaway ("Plaintiff") and Defendant Mercedes Benz USA, LLC ("Defendant" or "MBUSA") (the "Settlement").  Class Counsel achieved the Settlement after three years of hard-fought litigation in which Class Counsel left no-stone unturned and spared no expense.  With no guarantee of ever getting paid for their time, Class Counsel spent 4,023 hours aggressively litigating this case on behalf of the Class.  With no guarantee of ever getting reimbursed, Class Counsel also incurred nearly $650,000 in out-of-pocket costs prosecuting the case.  Class Counsel's efforts resulted in a settlement that provides tremendous benefits to the Class.  The three primary benefits of the Settlement are as follows:

*First*, Class Members can receive a <u>free</u> bypass wire repair procedure at any authorized, independently owned Mercedes-Benz dealership.  This procedure is intended to eliminate the risk of a future seat heater malfunction like the ones alleged in this lawsuit.  This procedure was developed as part of this Settlement.  It will be covered by Mercedes-Benz standard 2-year parts warranty.  Based upon the number of Subject Vehicles (approximately 270,000), Plaintiff's economic expert, Greg Pinsonneault, estimates that the total retail value of this repair to the Class is approximately $75,600,000 (270,000 vehicles x $280 per repair).  [Declaration of Greg Pinsonneault ("Pinsonneault Decl."), ¶¶ 10-12.]

*Second*, Class Members who do not elect the bypass repair procedure will automatically receive extended warranty coverage in the event the seat heater in their vehicle experiences the seat heater malfunction alleged in this lawsuit.  Specifically, if a Class Member does not elect the bypass repair procedure, MBUSA will contribute to the cost of any necessary future repairs, subject to certain time and mileage limitations.  Class

Members do not have to submit a claim form or do anything else to receive this benefit.[1]

*Third*, Class Members who previously experienced the alleged seat heater issue and paid to have it repaired can receive a reimbursement for the reasonable costs incurred, up to $1,000 per repair.  Class Members can obtain the benefits of this option, in addition to one of the two options offered above.  Based on expert analysis of the data provided by MBUSA, Plaintiff's expert estimates that approximately 20,107 of the Subject Vehicles will experience or have experienced a seat heater malfunction after 50,000 miles (MBUSA's warranty expires after 50,000 miles).  This estimate does not include vehicles that were reportedly repaired by MBUSA during the warranty period, or after the warranty period (as part of a goodwill repair).  Given the age of the Subject Vehicles (which are now 10 to 17 years old), Pinsonneault conservatively estimates that at least half of the 20,107 Subject Vehicles have already experienced the malfunction, for a total of 10,054 vehicles.  Thus, the total value of the repair reimbursement option is at least $10,054,000 (10,054 x $1,000).  [Pinsonneault Decl., ¶¶ 5-9.]

By this motion, Class counsel seeks an award of attorneys' fees in the amount of $5,662,387.50.   That amount is just 6.6% of the Settlement's overall value of the Settlement.  Plaintiff also seeks reimbursement of $584,085.21 in costs (which is more than a 15% discount relative to Class Counsel's actual out-of-pocket costs of almost $650,000).  Plaintiff, Mr. Callaway, further seeks an incentive award of $10,000 for his time, effort and dedication to this matter as the class representative.  Pursuant to the terms of the Settlement, these awards will be separately paid by MBUSA, and will not in any way reduce the amount of monetary benefits available to the Class.  Accordingly, for the reasons provided herein, Plaintiff and Class Counsel request that this motion be granted.

## II.  CASE BACKGROUND AND HISTORY

This lawsuit concerns Plaintiff's allegation that the seat heaters in certain Mercedes Benz vehicles contain a design defect that can cause the seat heater to overheat, spark,

---

[1] Class Members electing the bypass wire repair will not receive this extended warranty coverage, because their vehicle will be covered by MBUSA's two-year parts warranty.

1  smoke and burn a hole through the seat while the driver is operating the vehicle.  [See

2  Dkt. Nos. 1, 165; Declaration of Jason M. Frank ("Frank Decl."), ¶ 8.]  Plaintiff alleges

3  that MBUSA knew about this defect for nearly two decades, and yet failed to disclose it

4  to customers.  [Id.]

5       Because the alleged problem will more likely occur after the warranty period

6  expires, Class Counsel elected to pursue a fraudulent non-disclosure theory as opposed

7  to a breach of warranty theory to maximize the chance of obtaining remedies on behalf

8  of all affected customers.  [Frank Decl., ¶ 9.]  To do this, Plaintiff needed to prove, inter

9  alia: (a) MBUSA knew about the seat heater defect; (b) the seat heater defect presented a

10 "safety risk" MBUSA was required to affirmatively disclose at the time of sale; (c)

11 consumers would consider the seat heater defect to be "material" when deciding whether

12 to purchase a Mercedes vehicle; and (d) the disclosure of the seat heater defect would

13 have materially impacted the price of the vehicle.  [Id.]  Establishing these points involved

14 highly technical engineering issues and complex conjoint analysis and economic studies

15 designed to isolate the effect a defective seat heater would have on the overall market

16 price of an automobile.  [Id.]

17      Elizabeth Callaway, Plaintiff's wife, personally experienced this defect when

18 driving the couple's 2007 Mercedes Benz R350.[2]  Ms. Callaway's seat heater started to

19 smoke while she was driving, ultimately burning a hole through her seat and dress.  [See

20 Dkt. No. 168.]  When Plaintiff and Ms. Callaway retained Class Counsel after the incident

21 happened in mid-2014, Class Counsel retained a consulting expert (Safety Research &

22 Strategies Inc.) to research how often this problem was occurring in Mercedes vehicles.

23 [Frank Decl., ¶ 10.]  Through this work, Class Counsel developed a large database of

24 public reports across the country concerning this problem in numerous Mercedes vehicles

25 – prior to filing the complaint.  [Id.]

26

27 [2] Ms. Callaway was also a named Plaintiff in this case.  However, her claims were
dismissed on summary judgment the grounds that her husband, Mr. Callaway, was the
28 person who signed the contract to purchase the vehicle.  See Dkt. No. 152.

3

After filing the lawsuit on December 18, 2014, Class Counsel met with MBUSA's counsel to attempt to isolate which models were primarily experiencing this problem, but MBUSA refused to offer any guidance. [Frank Decl., ¶ 11.] Even more challenging, MBUSA claimed the engineering data regarding this problem was in the possession of its German parent and outside the reach of US discovery pursuant to Supreme Court jurisprudence. [Id.]

Undaunted, Class Counsel began purchasing exemplar seats from numerous Mercedes models throughout the country and retained a highly-respected engineering expert (Dr. Gerald Zamiski, the President of Vollmer-Gray Engineering Laboratories, Inc.) to inspect the seats to determine the root cause of the problem and the models affected. [Frank Decl., ¶ 12.] Class Counsel also retained a former senior enforcement attorney from the National Highway Transportation Safety Administration ("NHTSA") -- Allen Kam of Highway Traffic Safety Associates, LLC -- to study whether this problem posed a safety risk, and advise counsel on how to develop evidence demonstrating the safety concerns. [Id.]

Class Counsel further conducted extensive discovery – which MBUSA resisted at nearly every turn – compiling and reviewing in excess of 120,000 pages of documents, including defendants' warranty reports, customer complaints, early warning reporting submissions to NHTSA, and emails about the problem going back to 1999. [Frank Decl., ¶ 13.] Class counsel was forced to subpoena MBUSA's former regulatory counsel to obtain the complete file of NHTSA reports and correspondence concerning the problem, and then forced to oppose a motion for a protective order filed by the former regulatory counsel in Maryland in order to obtain the data. [Id.] Class Counsel also travelled across the country on numerous occasions to take depositions establishing MBUSA's knowledge about the problem, in addition to numerous depositions in Northern California. [Id.] Class Counsel also spent considerable time before the Magistrate (the Hon. Douglas F. McCormick) – winning key discovery battles. [Id.] Class Counsel's

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEYS' FEES, COSTS AND INCENTIVE AWARD**

time before the Magistrate included multiple formal motions to compel, numerous informal letter briefs and numerous informal discovery conferences.  [Id.]

   Through the engineering expert work and analysis of the warranty and complaint reports, Plaintiff and Class Counsel were able to determine the defect primarily existed in Mercedes SUVs, specifically the 2000-2007 M-Class, 2006-2007 R-Class and 2007 GL-Class vehicles.   [Frank Decl., ¶ 14; Dkt. Nos. 168-3, 168-4 and 192-10.]   A comparison of the high incident rates in Mercedes SUV's (at times occurring in over one in ten vehicles) against non-SUVs (which experienced minimal incidents) vividly demonstrated the material problem in the SUVs and contradicted MBUSA's claim this was a de minimis "wear and tear" issue caused by "individual issues." [Id.; Dkt. No. 168-3 at Exh. 3.]  By the time of expert discovery, even MBUSA's own engineering expert was forced to admit the "root cause" of the problem was the copper-wire design of the seat heaters in the Subject Vehicles.  [Frank Decl., ¶ 14.]

   But proving a common defect alone would not be sufficient to obtain class certification; Plaintiff would also need to present evidence the seat heater problem would be considered "material" to consumers and have a negative effect on the price paid for the vehicles.  [Frank Decl., ¶ 15.]  Because consumers do not purchase seat heaters as a stand-alone product, this would entail a complicated damage analysis attempting to isolate the economic impact on the market price caused by a defect in a subcomponent of a vehicle.  [Id.]

   Accordingly, Class Counsel retained one of the leading experts in the field of conjoint analysis (Dr. R. Sukumar, the CEO of Optimal Strategix Group, Inc.) – who regularly assists Fortune 500 companies set prices on their products based on changes to small product features.  [Frank Decl., ¶ 16.]  This study involved extensive consumer surveys and analysis.  [Id.; Dkt. No. 168-2.]  Class Counsel also retained other survey experts to replicate different survey methodology that counsel anticipated MBUSA would use to counter Dr. Sukumar's analysis, so Plaintiff would be prepared to address MBUSA's challenges.  [Frank Decl., ¶ 16.]  Conjoint analysis is a highly complicated

5

scientific technique that has been the subject of rigorous examination by federal courts in recent years.  [Id.]  When done right, it has been approved by federal courts as an appropriate method to calculate damages on a class wide basis, where other damage models have failed.  [Id.]  It is also very expensive, costing Class Counsel approximately $200,000 in this case.  [Id.]  Class counsel also retained economic and damage experts (Litnomics – Bruce McFarlane and Greg Pinsonneault) and a consultant (Colin Weir) to analyze Mercedes' economic and pricing data to buttress the results of the conjoint analysis, and avoid the missteps that had resulted in so many prior lawsuits losing on class certification.  [Id.; Dkt. Nos. 168-3.]

Even before getting to the Class certification stage, Class Counsel had to successfully oppose numerous legal challenges brought by Defendants on highly complex issues. [Frank Decl., ¶ 17.]  Class Counsel defeated MBUSA's motion to dismiss and motion to strike at the pleading stage.  [Id.; Dkt. No. 42.]  Class Counsel then defeated MBUSA's motion for summary judgment, including convincing this Court to reverse its tentative opinion granting summary adjudication against Plaintiff's common law fraud claim.  [Frank Decl., ¶ 17; Dkt. No. 152.]  This required extensive briefing and legal analysis, including Court-ordered supplemental briefing on novel legal questions such as whether privity is required for a duty to disclose in the resale context under the common law, the UCL and the CLRA.  [Frank Decl., ¶ 17; Dkt. Nos. 136, 151.]  Through Class Counsel's work and extensive experience in fraud class actions, Plaintiff was able to survive MBUSA's legal challenges.  [Frank Decl., ¶ 17.]

The attorney-hours and finances committed to this lawsuit were substantial, with Class Counsel incurring over $3.43 Million in time and nearly $650,000 in out-of-pocket expenses.  [Frank Decl., ¶ 18.]  This effort culminated in full class certification briefing and oppositions to three separate Daubert motions that were ready to be heard by the Court.  [Id.; Dkt. Nos. 168 through 169 and 192 through 192-12]  MBUSA ultimately agreed to settle this lawsuit prior to class certification.  [Frank Decl., ¶ 18.]

## III.   SUMMARY OF THE SETTLEMENT AND ESTIMATED VALUE

### A.   The Settlement Class

The Settlement Class includes all current and former owners and lessees of Mercedes-Benz model year 2000-2007 M-Class, model year 2006-2007 R-Class, and model year 2007 GL-Class vehicles with original-equipment seat heaters who purchased or leased their Subject Vehicles in the United States (the "Subject Vehicles"). [Settlement (Dkt. No. 216-2), § 1.25.] Excluded from the Class are former owners and lessees whose Subject Vehicle did not experience a seat heater malfunction during the time they owned or leased their Subject Vehicle, as well as a few others. [Id.]

### B.   The Settlement's Primary Terms

#### 1.   Free Repair for Current Owners.

Class Members who submit a valid claim form electing this option will receive a bypass wire repair procedure free of charge at an MBUSA authorized, independently owned and operated dealership of their choice. [Settlement, § 4.1.] The bypass wire repair procedure is intended to eliminate the risk of a future seat heater malfunction like the ones alleged in this lawsuit. [Id., § 1.5.] The repair involves installing a bypass wire in the seat cover. [Id.] The bypass wire repair procedure will be covered by MBUSA's standard 2-year parts warranty. [Settlement, § 4.2.]

The total value of this free repair for the Class is approximately $75,600,000. [Pinsonneault Decl., ¶ 12.] Specifically, under the Settlement, MBUSA has agreed to reimburse its authorized dealers for each bypass wire repair they perform for a Class Member. [Settlement, § 4.1; Frank Decl., ¶ 24(a).] MBUSA has represented this will internally cost MBUSA approximately $200 per repair based on the costs for parts and labor. [Frank Decl., ¶ 24(a).] According to the data produced in discovery by MBUSA, Plaintiff's expert estimates that the typical retail markup for this type of work (i.e., the amount customers would be charged for this repair) would be over 40%.[3] [Pinsonneault

---

[3] In particular, MBUSA produced exemplar pricing information related to the dealer, wholesaler and suggested list prices (parts and labor) for replacing the seat cushion that

Continued on the next page

7

Decl., ¶ 11.] Thus, Plaintiff's expert estimates the retail value of the repair to be $280. [Id.] Given that there are approximately 270,000 vehicles covered by this Settlement, the total value of the free repair is approximately $75,600,000 (270,000 x $280). [Id.]

### 2. Extended Warranty on Seat Heaters.

Class Members who do not select the bypass wire repair procedure will automatically receive warranty coverage on a future seat heater repair performed at an authorized, independently owned and operated Mercedes Benz dealership to the extent the repair is made to address an issue alleged in this lawsuit, subject to the following limitations:

- **Vehicles with Less Than 40,000 Miles**: MBUSA will cover 75% of the repair cost.

- **Vehicles with Between 40,000 and 80,000 Miles**: MBUSA will cover 50% of the repair cost.

- **Vehicles with Between 80,000 and 140,000 Miles**: MBUSA will cover 25% of the repair cost.

- **Vehicles with Between 140,000 and 180,000 Miles**: MBUSA will cover 15% of the repair cost.

- **Vehicles with More Than 180,000 Miles or Which Need Repair More Than 2-years <u>After</u> the Effective Date of this Settlement**: MBUSA will have no obligation to cover the costs of a repair.

[Settlement, §§ 4.3 – 4.3.2.] Because this is an alternative option to the free bypass wire repair procedure, Plaintiff's expert has not attempted to independently determine the value of this benefit. [Pinsonneault Decl., ¶ 13.] Instead, to avoid double counting, Plaintiff's expert is assuming its value is covered by estimated value for the bypass wire repair procedure ($75,600,000). [Id.] However, as explained further below, it is considerably more expensive to repair the seat after a malfunction occurs (around $1,000)

contains the seat heater element. Plaintiff's 40% estimate of the retail mark-up is based on that data. [Pinsonneault Decl., ¶ 11.]

1  as compared to the cost of the bypass wire repair procedure (approximately $280), so

2  extended warranty coverage provides a significant economic benefit to the Class.

3                      **3.     Reimbursement for Past Repairs.**

4          Current and former owners or lessees who previously paid for seat heater repairs

5  caused by the alleged defect at issue in this lawsuit will receive reimbursement for any

6  costs they paid for the repairs up to a maximum amount of $1,000 per repair. [Settlement,

7  § 4.5.]  Based on MBUSA's records and representations, the outer limit for the cost of

8  this repair in the past (at an MBUSA authorized dealer) has been approximately $1,000.

9  [Frank Decl., ¶ 24(c).]  The reason why it costs more to repair a seat after a seat heater

10 malfunction occurs (up to $1,000) as compared to the cost of the bypass wire repair

11 procedure (approximately $280) is that Mercedes typically replaces the entire seat cover

12 after the malfunction occurs because the seat cover (which includes the seat heater

13 element) will have burned a hole through the seat.  [Id.]

14         Plaintiff's expert has determined that the value of this reimbursement option is

15 conservatively over $10,054,000.  [Pinsonneault Decl., ¶¶ 6-9.]  This was determined by

16 projecting the total number of vehicles that will experience a malfunction based on the

17 rate of malfunctions that were reported to Mercedes during the 50,000-mile warranty

18 period – approximately 20,107 vehicles.  [Id.]  Plaintiff's expert then assumed that

19 approximately half of these vehicles (10,054 vehicles) will have already experienced the

20 malfunction, which is a conservative assumption given the age of the vehicles.  [Id.]  He

21 then multiplied the estimated number of vehicles that have experienced a malfunction

22 (10,054) by the repair cost ($1,000) to determine that this Settlement likely provides over

23 $10,054,000 in repair reimbursements available to the Class.  [Id.]

24                 **4.     Attorneys' Fees, Incentive Awards and Administration Costs.**

25         The Settlement provides that Defendants will separately pay for any attorney fees

26 and costs awarded by the Court to Class Counsel, so long as the amount of attorneys'

27 fees does not exceed $5,662,387.50 and the amount of costs does not exceed

28 $584,085.21.  [Settlement, § 5.3.]  Defendant also will separately pay for any incentive

9

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEYS' FEES, COSTS AND INCENTIVE AWARD**

1  award approved by the Court for Plaintiff, so long as the amount does not exceed $10,000.

2  [Id. at § 5.2.] Defendant further will be solely responsible for the notice and claims

3  administration costs. [Id. at § 8.1.] Defendant's payments of these amounts will not in

4  any way reduce the total benefits available to the Class.

5          **5.      Release.**

6          In exchange for the above-described Settlement benefits, all Class Members who

7  do not timely "opt-out" or request exclusion from the Class will release all claims against

8  Defendant and its related entities which are "on account of or related to claims that the

9  seat heaters in the Subject Vehicles are inadequate or of poor or insufficient quality or

10 defective, due to wear or otherwise, which were alleged or could have been alleged as to

11 the Subject Vehicles in the Litigation or in similar actions." [Settlement, § 6.1.]

12 However, this release expressly *excludes* and does not affect "claims for personal injuries

13 or wrongful death." [Id.]

14 **IV.    THIS MOTION SHOULD BE GRANTED**

15      **A.    Class Counsel's Fee Request Is Fair, Reasonable and Appropriate.**

16          In deciding whether a requested fee amount is appropriate, the Court's role is to

17 determine whether such amount is "fundamentally 'fair, adequate, and reasonable.'"

18 Staton v. Boeing Co., 327 F.3d 938, 963 (9th Cir. 2003) (quoting Fed. R. Civ. P. 23(e)).

19 In the Ninth Circuit, there are two methods of determining attorneys' fees: the percentage

20 of the benefit method and the lodestar method. Under the percentage of the benefit

21 method, Courts will award attorneys' fees equal to a percentage of the total monetary

22 benefits available to the Class. In comparison, under the lodestar method, the Court will

23 multiply the number of attorney hours incurred by a reasonable hourly rate in the

24 community for similar work. McElwaine v. U.S. West, Inc., 176 F.3d 1167, 1173 (9th

25 Cir. 1999). The Court may then raise or lower the lodestar based on several factors. See

26 Kerr v. Screen Extras Guild, Inc., 526 F.2d 67, 70 (9th Cir. 1975); Fischel v. Equitable

27 Life Assurance Soc'y, 307 F.3d 997, 1007 n. 7. Class Counsel's fee request here is fair,

28 adequate and reasonable under either approach.

1

### 1.   Class Counsel's Fee Request Is Fair and Reasonable Under the Percentage of the Benefit Method.

2    The preferred method for determining attorneys' fees in the Ninth Circuit is the

3  "percentage of the benefit" approach, whereby the Court will award attorneys' fees equal

4  to a percentage of the total monetary benefits available to the Class.   Vizcaino v.

5  Microsoft Corp., 290 F.3d 1043, 1047 (9th Cir. 2002); In re: Toyota Motor Corp

6  Unintended Acceleration Litigation, C.D. Cal. Case No. 8:10-ml-02151-JVS-FMO,

7  Order re: Fees (Dkt. No. 3802) at p. 4, n. 6 (Judge Selna).  The percentage of the benefit

8  method is favored over a lodestar approach because it "more closely aligns the interests

9  of the counsel and the class, i.e., class counsel directly benefit from increasing the size of

10 the class fund and working in the most efficient manner." Vizcaino, 290 F.3d at 1047.

11    The benchmark award of attorneys' fees in "common fund" or "constructive

12 common fund" cases is 25%.  In re Bluetooth Headset Prods. Liabl. Litig., 654 F.3d 935,

13 942 (9th Cir. 2011) (citing Six Mexican Workers v. Ariz. Citrus Growers, 904 F.2d 1301,

14 1311 (9th Cir. 1990).)  When a settlement provides monetary benefits on a claims-made

15 basis but does not create a common fund fixing the amount of benefits available to the

16 Class, "the Ninth Circuit may analyze the case as a 'constructive common fund' for fee-

17 setting purposes." Nwabueze v. AT & T Inc., 2013 WL 6199596, at *11 (N.D. Cal. Nov.

18 27, 2013) (quoting In re Bluetooth Headset Prods. Liabl. Litig., 654 F.3d 935, 941-943

19 (9th Cir. 2011)).

20    "To calculate appropriate attorneys' fees under the constructive common fund

21 method, the Court should look to the maximum settlement amount that could be claimed."

22 Nwabueze, 2013 WL 6199596, at *11.  Courts have long looked to the entire value of the

23 benefits made available to class members, even in cases where it is unlikely all or most

24 of the benefits will be claimed.  Lopez v. Youngblood, 2011 WL 10483569, at *12 (E.D.

25 Cal. Sept. 1, 2011) ("It is well established that, in claims made or class reversion cases

26 where there is a maximum fund, and unclaimed funds revert to the defendant, it is

27 appropriate to award class fund attorneys' fees based on the gross settlement value");

28 accord Boeing v. Van Gemert, 444 U.S. 427, 479-81 (1980) (concluding that class

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEYS' FEES, COSTS AND INCENTIVE AWARD**

counsel may recover a fee based on entire common fund created for class, even if some class members make no claims against the fund); Williams v. MGM-Pathe Commc'ns Co., 129 F.3d 1026, 1027 (9th Cir 1997) (reversing award of attorneys' fees because trial court failed to base fee award on the entire settlement, rather than the amount claimed).

In the present case, the total value of the Settlement benefits made available to the Class is over $85,654,000.  [Pinsonneault Decl., ¶ 12.]  This includes the free bypass wire repair procedure for 270,000 vehicles (with a total retail value of approximately $75,600,000) and reimbursement for past repairs (with a total estimated value of approximately $10,054,000).  [Id.]  Accordingly, Class Counsel's fee request represents approximately 6.6% of total gross value of the Settlement.  This is well below the 25% benchmark used in the Ninth Circuit.  Vizcaino, 654 F.3d at 1048.  On this basis alone, Class Counsel's fee request is more than fair and reasonable.

Class Counsel's fee request is further justified by the factors commonly used to assess appropriate attorneys' fees.  "Although not mandated by the Ninth Circuit, courts often consider the following factors when determining the benchmark percentage to be applied: (1) the result obtained for the class; (2) the effort expended by counsel; (3) counsel's experience; (4) counsel's skill; (5) the complexity of the issues; (6) the risks of nonpayment assumed by counsel; (7) the reaction of the class; and (8) comparison with counsel's lodestar."  Aichele v. City of Los Angeles, 2015 WL 5286028, at *5 (C.D. Cal. Sept. 9, 2015); see also Vizcaino, 290 F.3d at 1048-50 (employing similar factors in its analysis).  Each of these factors supports Class Counsel's fee request.

- **The Result Obtained for the Class.**   The Settlement achieves a tremendous result for the Class.  For example:

  o *The Settlement Essentially Provides a Recall:*   Because the fundamental premise of this lawsuit is the seat heater problem presents a safety risk, Class Counsel insisted that MBUSA figure out how to fix the problem and provide the repairs for free to the Class.  [Frank Decl., ¶ 30(a).]  And after nearly two decades, and two NHTSA investigations, MBUSA finally figured out how to fix the problem before it

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEYS' FEES, COSTS AND INCENTIVE AWARD**

occurs.  [Id.; Dkt. No. 109-4 at Exhs. C, D; Dkt. No. 167-1 at Exh. E, F.]  Class Counsel and Plaintiff achieved this primary objective for the Class because they were willing to "walk-away" from any settlement that did not include this remedy. [Frank Decl., ¶ 30(a).]

o      *The Settlement Provides Full Reimbursement for Past Repairs.*  The Settlement provides full reimbursement past repairs, limited only by the maximum reasonable cost of the repair ($1,000) based on MBUSA's records. [Frank Decl., ¶ 30(b); Pinsonneault, ¶ 7.]  As with the free repair, Counsel and Plaintiff achieved this result because they were willing to "walk away" and hold out for the best deal for the Class. [Frank Decl., ¶ 30(b).]

o      *The Settlement Goes Above And Beyond The "Usual" Automotive Class Action Settlement.*  The *free* bypass repair procedure standing alone provides an extraordinary result to the Class. [Frank Decl., ¶ 30(c).]  This repair benefit is in *addition to* the benefits typically included in automotive class action settlements.   [Id.] Specifically, as a review of automotive class action settlements demonstrates, such settlements typically only provide the class with an extended warranty and/or reimbursement for past repairs.  [Id.]  Such settlements are routinely approved as fair, adequate and reasonable.  See, e.g., Sadowska v. Volkswagen Grp. of Am., Inc., No. CV 11-00665-BRO AGRX, 2013 WL 9600948, at *3 (C.D. Cal. Sept. 25, 2013) (describing an auto settlement that provided for a warranty extension and a reimbursement program as providing "substantial benefits to the Class"); Eisen v. Porsche Cars N. Am., Inc., 2014 WL 439006, at *4 (C.D. Cal. Jan. 30, 2014) ("It is unquestionable that the settlement provides substantial relief to all class members in the form of reimbursement for costs and expenses incurred due to the alleged IMS defect and extended warranty protection in the future.").  This Settlement includes both an extended warranty and reimbursement for past repairs, in addition to the free bypass wire repair procedure.  This demonstrates the extraordinary nature of the relief provided to the Class under this Settlement.

• **The Time and Labor Required.**  As discussed above, this case required a tremendous investment of time, effort and resources.  [Frank Decl., ¶ 31.]  For example,

MBUSA, on two separate occasions, convinced NHTSA to close an investigation into the alleged defect on the grounds a "safety defect trend" had not been identified.  [Id.; Dkt. No. 109-4 at Exhs. C, D.]  To prevent a similar outcome – which Class Counsel believed was wrong – Class Counsel did its own leg-work both prior to and after the filing of the lawsuit, such as developing a database of reported problems across the U.S. and purchasing seats from various Mercedes models for inspection by experts.  [Frank Decl., ¶ 31.]  After the filing of the lawsuit, part of MBUSA's defense strategy was to make it as difficult as possible for Plaintiff to develop the factual record in this case.  [Id.]  For example, MBUSA claimed its parent company in Germany (Daimler AG) had the relevant engineering documents and other records related to the seat heaters, but that such records were not in its possession, custody or control since it is just a distributor of the vehicles.  [Id.]  On that basis, MBUSA successfully refused to produce such documents and successfully argued that Daimler AG is not subject to the jurisdiction of the U.S. courts and thus cannot be compelled to produce the documents.  See Seifi v. Mercedes Benz USA, LLC, 2014 WL 7187111 (N.D. Cal. Dec. 16, 2014); Daimler AG v. Bauman, 134 S.Ct. 746 (2014).  Even as to documents in MBUSA's possession, MBUSA generally resisted discovery until Class Counsel filed motions to compel or otherwise brought the matter to the attention of the Magistrate.  [Id.]  This "defend every field and do not give an inch" strategy by MBUSA substantially increased the time and labor required for Class Counsel in an already complex and time-consuming case.  [Id.]  Nevertheless, Class Counsel was able to overcome these obstacles for the benefit of the Class.  [Id.]

• **The Novelty and Difficulty of the Issues Involved.**  This case involved highly complex legal issues that are far from settled and are at the forefront of current federal and California jurisprudence.  [Frank Decl., ¶ 32.]  For example, this case involved such issues as (a) when does an automobile manufacturer have a duty to disclose a defect under California law; (b) what qualifies as a "safety risk"; (c) what is the duty to disclose to a down-stream purchaser; (d) does the class member need to be in privity with the defendant; (e) is a purchaser of a used vehicle too far removed from the chain of sale

to maintain fraud claims; (f) what do you need to show to establish knowledge of a defect; (g) what failure rate percentage is "material" in an automobile defect case; (h) how do you determine the market value of a component part in an automobile when there is no separate "market" for the component; (i) how do you determine the market value of a component part that is typically sold as part of a package; (j) is conjoint analysis an accepted method of damage analysis; (k) was the conjoint study properly conducted in this case; (l) does conjoint analysis improperly use averages to mask differences in consumer preferences that would otherwise create predominate individual issues; (m) can you obtain class certification in a case involving multiple models of vehicles with different failure rates; (n) can you maintain a class action when only some class members have experienced the malfunction; and the list goes on and on.  [Id.]

•   **The Skill Requisite to Perform the Legal Services Properly.**  The legal and factual issues in this case required a high degree of skill and expertise to litigate. [Frank Decl., ¶ 33.]  In class action litigation, there are many traps for the unwary that can result in losing class certification when not anticipated and dealt with up front.  [Id.] But here, because of Class Counsel's background defending Fortune 500 companies in consumer fraud class actions, Class Counsel was well aware of the defenses and arguments MBUSA's counsel would employ to argue against class certification.  [Id.] Class Counsel also had extensive experience litigating the complicated and highly technical engineering issues involved in this matter.  [Yuhl Decl., ¶ 4; McNicholas Decl., ¶ 4.]  By anticipating and addressing these arguments at the beginning of the case, Class Counsel was able to develop a factual record that maximized the chances of winning on class certification and on the merits at trial, which resulted in the Settlement of this lawsuit.  [Frank Decl., ¶ 33.]

•   **The Preclusion of Other Employment by Class Counsel Due to Acceptance of this Case.**  The Class Counsel in this case are three relatively small firms. [Frank Decl., ¶ 34; Yuhl Decl., ¶ 6; McNicholas Decl., ¶ 6.]  They can only handle so many complex class actions like this one, especially given that they are investing so much

15

time and money in the case.  [Id.]  By necessity, Class Counsel is required to be highly selective when choosing whether to invest in a case, because cases like this take years to resolve before they see any potential return.  [Id.]

• **Whether the Fee Is Fixed or Contingent.**  This case was taken on a full contingency.  [Frank Decl., ¶35; Yuhl Decl., ¶ 12(a); McNicholas Decl., ¶ 11(a).]  Unlike defense counsel who were being paid by the hour, Class Counsel worked without compensation for years with the chance they would never get paid.  [Id.]  Class Counsel also paid nearly $650,000 in costs, knowing full well that, if they lost, these costs would be unrecoverable.  [Id.]

• **The Amount Involved and Results Obtained.**  As established above, the Settlement provides an exceptional result for the Class and over $85 Million in benefits. [Pinsonneault Decl., ¶ 13.]

• **The "Undesirability" of the Case and Risks Inherent in Litigation.**  This was a difficult case for Class Counsel to take on, with a far from certain outcome.  [Frank Decl., ¶ 37.]  The fact that NHTSA closed two investigations about this problem without further action always made this case a risky gamble.  [Id.]  But through Class Counsel's hard work and dedication, this gamble paid off for the Class.  [Id.]

Accordingly, Class Counsel's fee request is more than justified under the percentage of the benefit method.

## 2.   The Fee Request Justified Under the Lodestar Method.

Under the lodestar method, Class Counsel's fee request is likewise fair and reasonable.  Class Counsel's current lodestar is $3,431,570.30.  [Frank Decl., ¶ 39(d).] Thus, Class Counsel's fee request currently includes a lodestar multiplier of 1.65.[4]  That multiplier is more than justified in this case, and falls within the range approved by courts

---

[4] By the time of final approval, that multiplier will be lower, as Class Counsel anticipates spending additional time between now and final approval working with the class administrator, communicating with class members, reviewing and responding to any objections, and preparing the motion for final approval, and preparing for and attending the final approval hearing.

16

in this circuit.  In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig., 2017 WL 3175924, at *4 (N.D. Cal. July 21, 2017) (approving lodestar multiplier of 2.02 as "more than reasonable given the complexities of this case, the skill and diligence of Class Counsel, and the extraordinary results achieved for the Class"); In re: Toyota Motor Corp Unintended Acceleration Litigation, Order re: Fees (Dkt. No. 3802) at pg. 5 (approving as reasonable a multiplier of 2.87, noting it was "within the range approved by courts within this Circuit").

For example, a recent Central District court decision cited with approval a holding that a multiplier of 2.43 is "*per se* reasonable" in a nationwide class action settlement. See Schulein v. Petroleum Dev. Corp., 2015 WL 12762256, at *1 (C.D. Cal. Mar. 16, 2015) (citing Been v. O.K. Industries, Inc., 2011 WL 4478766, at *11 (E.D. Okla. 2011) (citing a study reporting the average multiplier in 1,120 class actions cases and find that a 2.43 multiplier would be "per se reasonable").

### a.    Ninth Circuit Law Requires a Risk Multiplier in this Case.

Under Ninth Circuit precedent, "[t]he district court must apply a risk multiplier to the lodestar when (1) attorneys take a case with the expectation they will receive a risk enhancement if they prevail, (2) their hourly rate does not reflect that risk, and (3) there is evidence the case was risky." Stetson v. Grissom, 821 F.3d 1157, 1166 (9th Cir. 2016); Stranger v. China Elec. Motor, Inc., 812 F.3d 734, 741 (9th Cir. 2016) (same); Fischel v. Equitable Life Assurance Soc'y, 307 F.3d 997, 1008 (9th Cir. 2002) (same).  "Failure to apply a risk multiplier in cases that meet these criteria is an abuse of discretion." Id. Here, each of these factors are met.

- *First*, Class Counsel took this case on a full contingency, and in doing so expected a risk enhancement if they prevailed.  [Frank Decl., ¶ 39(e)(i); Yuhl Decl., ¶ 12(a); McNicholas Decl., ¶ 11(a).]  "It is an established practice in the private legal market to reward attorneys for taking the risk of non-payment by paying them a premium over their normal hourly rates for winning contingency cases." Fischel, 307 F.3d at 1008.

"A contingent fee must be higher than a fee for the same services paid as they are performed.  The contingent fee compensates the lawyer not only for the legal services he renders but for the loan of those services." Graham v. Daimler Chrysler Corp., 34 Cal. 4th 553, 580 (2004).

- *Second*, Class Counsel's hourly rates are commensurate with market rates for hourly defense counsel of their experience and do not reflect the risk associated with this being a contingency case.  [Frank Decl., ¶ 39(e)(ii)-(iii); Declaration of Eric F. Yuhl ("Yuhl Decl."), ¶ 12(b)-(c); Declaration of Patrick M. McNicholas ("McNicholas Decl."), ¶ 11(b)-(c).]

- *Third*, this case was very risky for Class Counsel.  As noted above, when Class Counsel took this case NHTSA had already closed two preliminary investigations into the alleged defect.  Moreover, Class Counsel committed themselves to fronting all the expenses in this case through trial and appeal.  [Frank Decl., ¶¶ 35, 39(e)(iv); Yuhl Decl., ¶ 12(d); McNicholas Decl., ¶ 11(d).]  Based on Class Counsel's experience, Class Counsel knew such expenses could easily exceed $500,000, and that reality was borne out as the case was litigated.  [Id.]  Class Counsel also knew that if they did not prevail, those expenses would be non-recoverable.  [Id.]  Those factors alone demonstrate the very risky nature of this case.

      **b.**        **The Requested Risk Multiplier Is Justified and Reasonable.**

The requested multiplier is justified under the Kerr "reasonableness" factors.  See Kerr v. Screen Extras Guild, Inc., 526 F.2d 67, 70 (9th Cir. 1975).  Under Kerr and its progeny there are "a host of 'reasonableness' factors, including the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment." Stetson, 821 F.3d at 1166 (quoting In re Bluetooth Headset Prod. Liab. Litig., 654 F.3d 935, 941-942 (9th Cir. 2011)).  An analysis of the Kerr factors demonstrates the appropriateness of a 1.65 multiplier:

- Class Counsel could not have been reasonably expected to obtain a better result for the Class.  This is of great importance, as "[f]oremost among [the Kerr factors]

18

is the benefit obtained for the class." In re Bluetooth, 654 F.3d at 942. Indeed, the excellent result obtained by Class Counsel, standing alone, is sufficient to justify the requested multiplier.

- The quality of representation provided by Class Counsel was excellent. Class Counsel are experienced class action litigators and obtained a superb result for the Class despite facing off against a well-financed, litigation savvy defendant represented by top-tier defense counsel with a particular expertise in auto defect class actions.

- The complexity and novelty of the issues presented was substantial, as discussed above.

- The multiplier is in line with other similar cases. In re Volkswagen, 2017 WL 3175924, at *4 (approving lodestar multiplier of 2.02; In re: Toyota, Order re: Fees (Dkt. No. 3802) at pg. 5 (approving as reasonable a multiplier of 2.87); Schulein, 2015 WL 12762256, at *1 (citing case approving lodestars in 2 to 3 range as per se reasonable).

- Finally, a fee award will not in any way reduce the amount of money available to the Class.

In sum, Class Counsel's fee request is reasonable under the lodestar method.

**B.** **Class Counsel's Request for Reimbursement of Expenses Is Reasonable and Appropriate**

"Class Counsel are entitled to reimbursement for out-of-pocket expenses that would normally be charged to a fee-paying client." Katz v. China Century Dragon Media, Inc., 2013 WL 11237202, at *8 (C.D. Cal. Oct. 10, 2013); see also Fed. R. Civ. P. 23(h). Here, Class Counsel incurred $648,644.41 in case related costs that would normally be charged to a fee-paying client. [Frank Decl., ¶ 39(b).] Pursuant to the Settlement, however, Class Counsel has agreed to limit its reimbursement request to $584,085.20, which represent more than a 15% discount relative to the actual costs incurred. That makes Class Counsel's cost reimbursement request all the more fair and reasonable.

1

### C.   Plaintiff's Incentive Award Request Is Fair, Reasonable, and Appropriate.

2   "Incentive awards are fairly typical in class action cases." Rodriguez v. W. Publ'g

3   Corp., 563 F.3d 948, 958 (9th Cir. 2009).  Further, numerous courts in the Ninth Circuit

4   approved incentive awards of $10,000 and higher where, as here, the class representative

5   has demonstrated a strong commitment to the case.  See Garner v. State Farm Mut. Auto.

6   Ins. Co., 2010 WL 1687832, at *17, n. 8 (N.D. Cal. Apr. 22, 2010) (collecting cases where

7   dedicated class representative received incentive award of $20,000 or more).

8   When considering requests for incentive awards, courts may consider five factors:

9   (1) the risk to the class representative in commencing suit, both financial and otherwise;

10   (2) the notoriety and personal difficulties encountered by the class representative; (3) the

11   amount of time and effort spent by the class representative; 4) the duration of the

12   litigation; and (5) the personal benefit (or lack thereof) enjoyed by the class representative

13   as a result of the litigation.  Van Vranken v. Atl. Richfield Co., 901 F. Supp. 294, 299

14   (N.D. Cal. 1995).  These factors favor Plaintiff's incentive award request.

15   *First*, Plaintiff is employed full-time.  [Callaway Decl., ¶ 2.]  While he did not

16   undertake any direct financial risk, his decision to commence suit brought with it the

17   inevitable risk and distractions resulting from holding full-time employment and also

18   being involved in class action litigation.  [Id.]  Thus, the first factor favors an incentive

19   award.

20   *Second*, Plaintiff encountered substantial difficulties by serving as the class

21   representative.  Plaintiff provided his Subject Vehicle to the experts for inspection, which,

22   pursuant to an agreement of the parties, was disassembled and placed in storage for over

23   two years.  [Callaway Decl., ¶ 3.]  In other words, Plaintiff sacrificed his vehicle for over

24   two years for the benefit of the Class.  [Id.]  Plaintiff's participation also led to him being

25   sued by his former counsel (Eagan Avenatti, LLP) and thus having to be involved as a

26   defendant in a separate lawsuit.  [Id.]  Thus, the second factor strongly favors an incentive

27   award.

28

*Third*, Plaintiff consistently communicated with his counsel about the status of the litigation, both in person, by phone and by email.  [Callaway Decl., ¶ 4.]  Plaintiff further actively participated in discovery.  [Id.]  Plaintiff was deposed and was involved in responding to written discovery and gathering responsive documents.  [Id.]  Plaintiff estimates he spent seventy-five (75) hours performing his duties as a class representative in this case.  [Id.]  Thus, the third factor favors an incentive award.

*Fourth*, this litigation is nearly three years old.  This factor likewise supports an incentive award.  See Fleury v. Richemont North America, Inc., 2008 WL 3287154 (N.D. Cla. Aug. 6, 2008) (citing three-year litigation as one reason for incentive award).

*Fifth*, Plaintiff is receiving no personal benefit from this lawsuit that is not enjoyed by the rest of the Class.  [Callaway Decl., ¶ 5.]

## V.    CONCLUSION

Based on the foregoing, Plaintiff requests this motion be granted.

Dated:  October 18, 2017                    FRANK SIMS & STOLPER LLP


                                            By:    /s/ Jason M. Frank
                                                   Jason M. Frank
                                                   Attorneys for Plaintiff